Dorothy PERRINE

v.

**Eugene MONTONE and Youth Study Center of Philadelphia.**

Civ. No. 75–1363.

United States District Court,
E. D. Pennsylvania.

Sept. 30, 1977.

Lawrence J. Fox, Philadelphia, Pa., for plaintiff.

Tyler E. Wren, Asst. City Sol., Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

In this civil rights action plaintiff contends that she was first disciplined, then transferred, and ultimately discharged from her employment at a juvenile detention facility in retaliation for the exercise of first amendment rights. The liability phase of the case was tried to a jury, which responded to interrogatories intended to resolve the factual disputes presented by the evidence. Having concluded that the jury's answers are inconsistent and that my charge was erroneous, I conclude there must be a new trial.

The evidence at trial was sufficient for the jury to find that the plaintiff, Dorothy V. Grady,[1] was employed at the Youth Study Center, Philadelphia's detention center for runaway and delinquent juveniles, from October 6, 1969, through January 26, 1974, in various capacities involving teaching, supervising, and organizing activities for the confined juveniles. At the time of the incidents giving rise to this suit plaintiff was classified pursuant to applicable regulations of the Philadelphia Civil Service Commission as a "supervisor I"[2] and was assigned to work on the night shift from 11:40 P. M. to 7:40 A. M. Mrs. Grady also was employed during the daytime as a public school teacher. Her dual employment did not contravene any applicable laws or regulations and was reflected in the records of the Youth Study Center and known to defendant, Eugene J. Montone, then executive director of the center and the defendant here.

On July 23, 1973, plaintiff wrote a letter to Philadelphia Mayor Frank L. Rizzo. Its thesis was that plaintiff was the victim of employment discrimination: first, she had not been promoted despite successfully passing a test which would have warranted such advancement; second, apparently she had unjustifiably been disciplined for being late; and third, persons earning more than she were given overtime work and she was not. By way of emphasizing the unfairness of the situation she pointed out that other employees reported to work intoxicated, used blackjacks to control children's behavior, and were so careless with the handling of keys that inmates had access to them.[3]

1. Plaintiff originally filed suit under the name Dorothy Perrine. She has since remarried and is now known as Dorothy V. Grady.

2. The term "supervisor" in plaintiff's job description apparently is utilized to designate the fact that she is responsible for supervising juveniles at the center. It is important to note that plaintiff did not occupy a supervisory position over other employees of the center.

3. In its entirety, the letter reads as follows:

July 23, 1973

The Honorable Frank Rizzo, Mayor
City of Philadelphia
City Hall
Philadelphia, Pennsylvania

Dear Mr. Rizzo:

I am employed at the Philadelphia Youth Study Center, at 2020 Pennsylvania Avenue, in the position of Supervisor I. Presently, as in the past, I am encountering numerous practices which are undoubtedly unfair to me and to other employees at the Center.

I have discussed some of these problems with Mr. Montone no longer than one month ago, and I have gotten no positive results. Since that time I have talked with the person at the Center in charge of personnel problems—I have still gotten no positive results to the problems.

I am concerned to know why persons unqualified to fill the position of Supervisor II and Supervisor III are allowed to function in those positions while persons such as myself who have taken a test (and passed that test) for the position of Supervisor II are disregarded. I feel there is something extremely wrong when capable and willing employees are disregarded for employees who came to work intoxicated, employees who resort to the use of blackjacks to control children, or others who leave their unit keys lying around for the use of the inmates. I feel secure in saying that if I had allowed the inmates to acquire (and permanently retain) my keys I would have been severely reprimanded, or relieved of my position. On the other hand, if an employee is given time off for being late six days out of the year, approximately two minutes each time, something is grossly lacking when nothing is done about incidents mentioned above.

When one enumerates the problem in dollars and cents, I don't understand how one employee can take home a check for nearly a thousand dollars which mine is not even three hundred; why people who earn a larger base pay than I (but who have not passed the civil service exams) are signed up for overtime in advance of its occurrence to function

The letter was acknowledged by a member of the mayor's staff, who advised Mrs. Grady that her complaints would be brought to the attention of the appropriate officials for whatever corrective action was deemed warranted.

Having learned of her letter to the mayor, Montone on October 12, 1973, suspended plaintiff for ten days "for making unfounded accusations against fellow employees."[4]

Plaintiff appealed her suspension to the Philadelphia Civil Service Commission on October 22, 1973.[5] Eleven days later, on November 2, 1973, Montone notified Mrs. Grady that she was being transferred to the day shift at the center. Her working hours on this shift (7:40 A. M. to 3:40 P. M.), of course, directly conflicted with those of her teaching job and precluded her continuing to occupy both positions. In a subsequent conversation with the plaintiff, Montone said that if she dismissed her attorney and abandoned the civil service appeal he would restore her to her position on the night shift. Mrs. Grady refused.

Due to the schedule conflict caused by her transfer, Mrs. Grady was unable to report for duty at the center. As a result on January 26, 1974, Montone dismissed her for unexcused failure to report for her assigned shift. Plaintiff also appealed this dismissal to the Civil Service Commission.

A consolidated hearing on all of plaintiff's appeals was held before the Commission in April and May, 1974. The Commission rendered its decision on July 16, 1974. With respect to plaintiff's suspension, the Commission held that her letter to the mayor was protected by the first amendment and therefore could not properly be the basis for taking disciplinary action against her.[6] Accordingly, it ordered that the suspension be set aside and that she be paid for the nine days in question.[7] However, with respect to the shift change, the Commission

---

as head supervisor in lieu of capable, experienced, personnel. Further, I don't understand why, under the present budget strains the City of Philadelphia has chosen to pay more to unqualified personnel when they can pay less to others who are qualified, and obtain a superior result.

If one considers the above-mentioned incidents; (1) the willingness of the employees who are not allowed to work, (2) the superior qualifications of those restricted employees, and (3) their stable and mature working patterns, one has only to conclude that there is a very obvious interplay of *discriminatory* practices at the Center. We have tolerated those unfair practices until they are no longer bearable. Hopefully Mr. Rizzo you will come to our aid.

Your immediate attention and consideration to this matter will be much appreciated.
Yours truly
(Mrs.) Dorothy V. Perrine

4. Plaintiff also received an October 1, 1973 annual performance rating of "needs improvement." It apparently is undisputed that during the previous three years plaintiff had always received superior ratings.

5. Plaintiff also appealed her performance rating to the Commission.

6. In relevant part the Commission stated:
The letter is part of the record and speaks for itself. We conclude its purport and intent was to advise the Mayor as to conditions and events appellant believed were relevant and necessary for him to know in order to implement investigation and institute corrective action. Appellant closed by inviting the Mayor's consideration and attention to the contents thereof. We have reviewed the letter, the testimony relating thereto, and the total circumstances surrounding this communication and believe it falls within the First Amendment free speech privilege. This conclusion is based upon the fact that the letter contains matters which should be before the Mayor for consideration regarding inefficiency and lack of security. One of the results of the letter was the Common Pleas Court became involved in the matter since its Family Division is charged with responsibility as to juveniles. Furthermore, some of the issues raised in the letter were not only relevant but appear to have had a basis in fact.

We recognize that whenever a public employee speaks out on an issue involving her job and the overall welfare of the community this type of discourse is privileged. Under the circumstances in the instant case, appellant's letter was protected and should not be the basis for her suspension. Whether or not what she stated therein was accurate is immaterial since we believe she did not act maliciously or with wanton disregard of the truth.
Opinion in the *Appeal of Dorothy Perrine,* Case No. 1556 S & D Pf, Philadelphia Civil Service Commission at p. 2 (July 16, 1974).

7. The Commission also set aside plaintiff's October 1 performance rating on the basis of procedural irregularities.

held that this action was not retaliatory but "necessary for the efficient operation of the Center." It therefore upheld her dismissal for failure to report for duty. Not satisfied with the Commission's decision, plaintiff thereafter instituted the present law suit against Montone and the Youth Study Center.[8]

With the exception of denying the offer to return plaintiff to the night shift if she dropped her civil service appeal,[9] Montone's main defense at the trial, as it had been before the Commission, was that his action in dismissing[10] the plaintiff was justified because of the detrimental effect her letter had on the normal functioning of the center. The evidence presented by the defense in this regard was sufficient for the jury to find that plaintiff's letter to the mayor led to dissension among the staff which caused chaotic conditions at the center. The problem began when excerpts from the letter were printed in the Philadelphia Tribune, a newspaper serving Philadelphia's black community.[11] The significance of the newspaper's constituency is that a majority of the center's staff is also black.

The defense did not seriously dispute that the charges contained in Mrs. Grady's letter had some basis in fact. The primary fault attributed to the charges was their generality. Montone testified that the staff became incensed by what it regarded as broad allegations of wrongdoing by unnamed employees that tended to mark the entire staff as suspect. This kind of lambasting, he stated, especially when printed in a newspaper which apparently enjoyed a good deal of community credibility was understandably upsetting to the staff members. Montone related that he was told by the staff, in effect, "You don't live in the black community as we do. We don't like to be called criminals." To make matters worse, having opened the Pandora's box with her general accusations, Mrs. Grady thereafter refused to provide any substantiation of her charges even when urged to do so by her union representative. At a meeting attended by Montone, Mrs. Grady, and a union representative, Montone asked Mrs. Grady for

---

**8.** The Youth Study Center was dismissed as a defendant at the close of the evidence. Although the minutes of the trial reflect that a directed verdict was entered in favor of the Center, this is incorrect; the real reason for discharging it was my view that it is not amenable to suit directly under the fourteenth amendment. See *Pitrone v. Mercadante,* 420 F.Supp. 1384 (E.D.Pa.1976), appeal pnd'g, Civil Action No. 76–2593 (3d Cir.). Originally, plaintiff's complaint did not assert jurisdiction under 28 U.S.C. § 1331 nor allege a cause of action based on the fourteenth amendment. However during the trial I orally granted plaintiff's motion to amend the complaint so as to preserve the issue for appeal, and simultaneously granted the Center's motion to dismiss.

Plaintiff asks that I reconsider my dismissal of the Center in light of the Supreme Court's decision in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). I fail to see the relevancy of the *Mt. Healthy* decision on this issue. In *Mt. Healthy* the Court did not reach the question of whether a cause of action may be asserted against a local governmental entity directly under the fourteenth amendment because the issue had not been raised below. Here, by contrast, the issue was raised before me and I therefore was obliged to decide it. For the reasons stated in *Pitrone,* supra, I believe my decision was correct.

**9.** Montone did testify, however, that he would have done anything to resolve the problems that developed at the center stemming from plaintiff's letter, including revoking her suspension and transferring her back to the night shift.

**10.** Under the particular circumstances presented here and in view of my disposition of the case I believe it is appropriate to treat the transfer as tantamount to a dismissal. If Mrs. Grady could not constitutionally be transferred to the day shift in the first place then obviously she could not be disciplined for failing to report for duty on that shift. Defendant has suggested that a plaintiff is not entitled to relief where the "cost" imposed on the purported exercise of first amendment rights is merely discipline and not dismissal. I do not reach this issue since I have decided to treat the transfer as a dismissal. See note 16, infra.

**11.** It is not at all clear how the Tribune acquired the letter. Plaintiff denied sending a copy of the letter to the newspaper. She admitted talking to a reporter from the Tribune about the Center, but denied having given him information which could have formed the basis for the story appearing in the paper.

her help in conducting an investigation of the charges so that the matter could be resolved as quickly as possible and things returned to normal. He asked her to be specific about her accusations—that is, to name names—inasmuch as civil service regulations required specific evidence to support any disciplinary actions that might have resulted from the investigation. Plaintiff refused to provide any additional information, explaining that her attorney had advised her not to answer any of Montone's questions.

Montone also testified that maintaining harmony and cooperation between staff members at the Youth Study Center, which houses all types of offenders from runaways to murderers, is essential to maintaining discipline and order at the facility. He noted that at the time plaintiff wrote her letter, tension at the center was already running high owing to the recent slaying of the warden of Philadelphia's Holmesburg Prison by an inmate of that institution and that plaintiff's charges only served to increase the unrest. The defendant stated that during this time he was meeting frequently with members of the staff and that the staff blamed plaintiff for the center's current problems and suggested that he (Montone) simply "kick the plaintiff out." [12]

The defendant advanced two specific reasons for transferring plaintiff to the day shift.[13] First, there was her inability to get along with the night superintendent and at least one other supervisor who worked on the night shift. Montone stated that Mrs. Grady had a personality conflict with the other supervisors and would not work with this person, ignored the team approach and insisted on doing things her own way, and needed closer supervision than it was possible to provide on the night shift. The second reason for the transfer was that Montone wanted Mrs. Grady to be working during the hours when he was present at the center so that if she observed any other incidents of the type about which her letter had complained she could report them to him immediately for verification. Montone said he realized the transfer would conflict with plaintiff's teaching job, but stated he felt the needs of the center had to come first and that the situation at the center was too critical to let plaintiff's outside employment interfere with his decision.

In rebuttal plaintiff disputed Montone's assessment of the level of disruption caused by her letter and his efforts to alleviate the problem. She testified there was no unrest or ill feelings toward her among the staff as a result of the letter, and that, in fact, no fellow supervisors ever said anything to her about it. With respect to Montone's claim that she refused to provide specific facts about alleged misconduct, Mrs. Grady stated that she was never given an opportunity to provide such information, but that if she had been, she would gladly have done so.[14] Moreover, she contended Montone and other members of the staff knew to whom her charges had referred.

To resolve the conflicting evidence, the following interrogatories were submitted to and answered by the jury:

### VERDICT

1. Did the letter written by Mrs. [Grady] to Mayor Rizzo

   (a) impede her performance of her duties at the Youth Study Center?

   Answer: No

12. Montone's testimony in this regard is corroborated by Exhibit 22, a copy of a petition to Montone, containing the signatures of forty-three Center employees, protesting the charges made by plaintiff and another night shift employee.

13. Montone also stated that he feared for plaintiff's safety although he did not indicate how transferring her to the day shift would alleviate this problem.

14. Grady testified that at the meeting with the union representative referred to by Montone, he and the union representative both presented their views, but that she was never given an opportunity to speak in her own defense. She also stated that the union representative told her that charging other union members with misconduct while a union member herself would put her in a precarious position and therefore that she should not say anything to Montone. It should be noted that neither the union nor any of its members have been named as defendants in this suit.

(b) have disruptive impact on the functioning of the Youth Study Center?

Answer: Yes

(c) interfere with harmonious relationships between Mrs. [Grady] and her co-workers or Mrs. [Grady] and her superiors?

Answer: Yes

(d) interfere with harmonious relationships between Mrs. [Grady's] co-workers and their superiors?

Answer: No.

(e) interfere with the operation of the Youth Study Center in general?

Answer: No

2. Was Mr. Montone's order transferring Mrs. [Grady] to the day shift motivated in whole or in part by a desire to retaliate against her for writing to Mayor Rizzo?

Answer: Yes

3. Did Mr. Montone refuse to transfer Mrs. [Grady] back to the night shift because she would not drop her appeal to the Civil Service Commission and dismiss her attorney?

Answer: No

In deciding the legal consequences that must flow from the jury's verdict, I first dispose of plaintiff's claim based upon Montone's alleged offer to reinstate her on the night shift if she would drop the appeal of her suspension to the Civil Service Commission. Plaintiff's theory was that this amounted to the placing of an unconstitutional condition (the loss of her right to vindicate first amendment rights through an appeal) on the receipt of a public benefit (employment at the Youth Study Center) and entitled her to relief on the rationale of cases such as *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). As noted earlier, the evidence on this point was sharply conflicting and the jury's answer to interrogatory No. 3 shows that it accepted Montone's story that he had never made the challenged offer. Therefore, without commenting on the efficacy of plaintiff's legal theory, I conclude that she is entitled to no relief on this claim.

Both my charge and the form interrogatories submitted to the jury were prepared with heavy reliance on the Third Circuit's decision in *Roseman v. Indiana University,* 520 F.2d 1364 (3d Cir. 1975), cert. denied 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976). For example, the second interrogatory was taken almost verbatim from the following language in *Roseman* :

It is not enough merely to find that other grounds were adequate for the discharge, . . . *Instead, the plaintiff need only prove that the discharge was "predicated even in part on his exercise of first amendment rights"* (citations omitted). *Id.* at 1367 (emphasis added). Moreover, I told the jury it would have to decide whether Montone was motivated in whole or in part by a desire to retaliate against Mrs. Grady. This was not said only once but was a dominant theme of the charge.

The trial in this case began on January 17, 1977, and lasted until January 21, 1977. On January 11, 1977, six days prior to the commencement of trial, the Supreme Court handed down its decision in *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Neither counsel nor I were aware of this decision until the trial had been completed.

*Mt. Healthy* involved a school teacher who claimed that his contract was not renewed because of his exercise of first amendment rights. The district court found that certain of plaintiff's activities—in particular his call to a local radio station protesting a teacher dress code—were indeed protected by the first amendment. The court also found, however, that there were reasons "independent of any First Amendment rights" which could have caused plaintiff's non-retention even if the board had not considered the constitutionally protected conduct. Nonetheless, applying a test which, if anything, is significantly more favorable to the defendant than that taken from *Roseman* and posed to the jury here, the trial court concluded that plaintiff was entitled to relief because his protected activity played a "substantial" part in the board's decision not to renew.

When the case reached the Supreme Court, the issue for decision was:

[W]hether, even if [the school board would have dismissed respondent in advance of the constitutionally protected incident] . . ., the fact that the protected conduct played a "substantial part" in the actual decision not to renew would necessarily amount to a constitutional violation justifying remedial action.

*Id.* at 285, 97 S.Ct. at 575. The Court held that even the "substantial part" test of causation applied by the district court was erroneous. Mr. Justice Rehnquist explained its shortcomings in the following terms:

A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* at 285–86, 97 S.Ct. at 575.

After enunciating the causation test set out above the Court went on to delineate the proper allocation of the burden of proof in administering this test:

Initially, . . . the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or to put it in other words, that it was a "motivating factor" (footnote omitted) in the Board's decision not to rehire him. Respondent having carried out that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Id.* at 287, 97 S.Ct. at 576.

Viewed in light of *Mt. Healthy,* it is apparent that my instructions placed an undue burden on the defendant and were incomplete. Interrogatory No. 2 was incomplete and erroneously framed and the jury's answer to this interrogatory does not resolve the causation question. The jury's affirmative answer to the second interrogatory established only that plaintiff's exercise of first amendment rights was a "motivating factor" in Montone's transfer decision. The defendant was entitled to the opportunity to prove that he would have transferred plaintiff anyway for non-protected reasons and to have the jury make a finding under appropriate instructions on this point.

Despite the errors just recited in the charge and interrogatories, plaintiff contends a new trial is not required. First she argues that there was never any suggestion during the trial that her transfer emanated from anything other than her letter to the mayor. While it is true that most of Montone's defense was devoted to showing that he could validly transfer plaintiff on the basis of the letter because of its disruptive impact, he did state there were other reasons for the transfer: plaintiff's inability to follow orders, her need for closer supervision, and his desire to be present so she could report any further incidents directly to him. Had I been

aware of the *Mt. Healthy* decision, I would have altered my charge and interrogatory No. 2. See *Henderson v. S. C. Loveland Co., Inc.*, 396 F.Supp. 658, 661–62 (N.D.Fla. 1975). Secondly, plaintiff contends that "while admittedly neither the parties nor the Court was aware of [*Mt. Healthy*] until [after the trial], the risk of this ignorance should fall on the party who seeks to assert the applicability of the case."[15] I cannot accede to this reasoning. There is in no sense a question of retroactivity involved here. The general rule is that a case will be decided on the basis of the law in effect at the time of the decision and in this case, even though neither the parties nor the court were aware of it, that law included *Mt. Healthy*. I can see no reason for penalizing the defendant for failing to bring this six day-old decision to the court's attention. See *Sulzbacher v. Continental Casualty Company*, 88 F.2d 122, 124 (8th Cir. 1937); cf. *Henderson*, supra at 660–61.

For the reasons stated above, I conclude that a new trial will be required in this case unless it can be determined that plaintiff's letter to the mayor was not protected by the first amendment. See *Roseman*, supra at 1367. The final matter to be decided, then, is whether or not such determination can be made.[16]

The Supreme Court has counselled that in making this determination it must be borne in mind that the state has a significantly greater interest in regulating the speech of its employees than it does in regulating the speech of the public in general. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

> The problem in any case is to arrive at a balance between the interests of the [public employee] . . ., as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.*, 391 U.S. at 568, 88 S.Ct. at 1734. Applying this balancing test to the facts of *Pickering*, the Court held that the dismissal of a teacher for writing a letter to a local newspaper criticizing the way the school board and the superintendent had handled certain bond issues violated the teacher's right of free speech. In reaching its decision the Court relied on the fact that Pickering's statements were only tangentially related to his employment status and therefore concluded that it was appropriate to treat him as a member of the general public for first amendment purposes. *Id.* at 574, 88 S.Ct. at 1738. The Court also was careful to note, however, that:

> The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate supervisors or harmony among co-workers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent, are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning.

*Id.* at 569–70, 88 S.Ct. at 1735. Numerous cases have held that statements which fall within the perimeters of the circumstances just described are outside the protection of the first amendment. See, e. g. *Sprague v. Fitzpatrick*, 546 F.2d 560, 564–65 (3d Cir. 1976), cert. denied 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), aff'g 412 F.Supp. 910 (E.D.Pa.1976); *Kannisto v. City*

---

**15.** Plaintiff's Second Post-Trial Memorandum at 3.

**16.** Formulating the question as whether or not plaintiff's letter is protected by the first amendment is in reality somewhat misleading. It is obviously true that the first amendment protected Mrs. Grady's "right" to send her letter to the Mayor in the sense that she could not be prevented from sending the letter. The real question is whether dismissal is a "cost" that may legitimately be imposed upon her as a consequence of writing her letter. See *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 2138 n. 1, 53 L.Ed.2d 1 (Stevens, J., dissenting).

*and County of San Francisco,* 541 F.2d 841, 844 (9th Cir. 1976), cert. denied 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977); *Roseman,* supra at 1368–69; *Smith v. United States,* 502 F.2d 512, 517 (5th Cir. 1974); *Meehan v. Macy,* 129 U.S.App.D.C. 217, 228–230, 392 F.2d 822, 833–35 (1968), modified 138 U.S.App.D.C. 38, 425 F.2d 469, aff'd en banc, 138 U.S.App.D.C. 41, 425 F.2d 472 (1969).

■ After consultation with counsel the questions contained in interrogatory No. 1 were submitted to the jury in an effort to have resolved certain factual matters which, under the case law discussed above, are relevant in application of the *Pickering* balancing test. On reflection, however, I conclude these questions were not formulated with sufficient precision and that the jury's answers to them are in irreconcilable conflict. Specifically, it will be noted that interrogatory 1(b) and interrogatory 1(e) are in reality merely alternative ways of asking the same question, viz. was the normal functioning of the Youth Study Center disrupted by Mrs. Grady's letter? Had the jury answered these questions consistently there would be no problem. Unfortunately, these answers are directly contrary to each other and the answer to No. 1(e) also is difficult to square with the answer to No. 1(c). Where, as here, the impact of the communication is sharply disputed and the jury's verdict does not resolve this question, it is simply impossible to apply the balancing test mandated by *Pickering.*

Accordingly, I conclude that there must be a new trial of all issues in this case with the exception of plaintiff's claim that Montone offered to reinstate her on the night staff if she would drop her Civil Service Commission appeal. See Fed.R.Civ.P. 59.