362 So.2d 124 (1978)
Fred COWELL, Executive Director, Dade County Public Health Trust, Appellant,
v.
Gloria FULLER, Appellee.
No. 77-1278.
District Court of Appeal of Florida, Third District.
August 22, 1978.
Rehearing Denied September 29, 1978.
Stuart L. Simon, County Atty. and R.A. Cuevas, Jr., Asst. County Atty., for appellant.
Long & Smith and Harold Long, Jr., Miami, for appellee.
Before HUBBART and KEHOE, JJ., and CHARLES CARROLL (Ret.), Associate Judge.
*125 HUBBART, Judge.
The central question involved in this appeal is whether the First Amendment to the United States Constitution precludes a governmental agency as an employer from disciplining one of its employees for making offensive, anti-semitic remarks on the job to a Jewish co-employee. We hold that no such constitutional prohibition exists under these circumstances and that a governmental agency as an employer may, in the interest of promoting employee harmony, discipline one of its employees for making such offensive remarks on the job to such a co-employee.

A
The critical facts of this case are undisputed. Fred Cowell, is the Executive Director of the Dade County Public Health Trust which operates Jackson Memorial Hospital in Miami, Dade County, Florida. The Dade County Public Health Trust in turn is governmentally owned and operated by Dade County, Florida. §§ 154.07 et seq. Fla. Stat. (1977).
On September 13, 1976, Mr. Cowell, in his capacity as Executive Director of the Dade County Public Health Trust operating Jackson Memorial Hospital, acted to impose disciplinary sanctions on one Gloria Fuller as an employee of such hospital. Approximately five months prior thereto, Mrs. Fuller had been demoted by her immediate supervisor to the position of Dietician I at the hospital. Mr. Cowell reinstated Mrs. Fuller to the position of Dietician III, but imposed two disciplinary sanctions as a condition thereto: (1) he disallowed her any back pay for the time she was temporarily demoted, and (2) he required her to write a letter of apology to her supervisor and to a co-employee to whom she had made certain insulting remarks. Mr. Cowell accepted the findings and recommendations which had been made in the case by a hearing examiner subsequent to Mrs. Fuller's demotion.
The basis for this limited disciplinary action by Mr. Cowell was a charge that Mrs. Fuller had made certain offensive anti-semitic remarks to a Jewish co-employee and thus had violated Ch. 10, § 6(b), (h) of the personnel rules of the Dade County Public Health Trust.[1] The record without dispute before the hearing examiner reflects that Mrs. Fuller in her supervisory capacity as a Dietician III at Jackson Memorial Hospital did in fact make certain offensive, anti-semitic remarks to a Jewish subordinate employee at the hospital, Mrs. Allen Korschun. These ethnic slurs took place over a period of time on the job at staff meetings and at other locations in the hospital in the presence of other hospital employees. Examples of these anti-semitic remarks were:
"You know about Jews, Mrs. Korschun, they are pushy and aggressive;"
"All Jews have money. Look at you Mrs. Korschun, your husband is a millionaire;"
"Did you ever see all those little old Jews on Miami Beach. They are so shriveled up, Mrs. Korschun, why is it that all Jews shrink like that."
On one occasion Mrs. Korschun asked for permission to leave work 15-30 minutes early and make it up the next day so that she could arrive home in time to celebrate Hanukkah. Mrs. Fuller denied the request and ridiculed Mrs. Korschun by saying:
"Mrs. Korschun, anyone who eats pork doesn't have to light Hanukkah candles on time."
Mrs. Korschun was known not to observe the orthodox Jewish dietary laws.
The above remarks greatly upset Mrs. Korschun who eventually complained to Mrs. Fuller's supervisors. Appropriate steps were taken to investigate Mrs. Korschun's complaints, and when found to be *126 true, Mrs. Fuller was demoted to Dietician I. Mrs. Fuller thereafter requested a hearing on the charges which was promptly held and at which she was represented by counsel. The hearing examiner after a full evidentiary hearing sustained the charge that offensive anti-semitic remarks were made to Mrs. Korschun on the job, but recommended less drastic disciplinary action. On the basis of the hearing examiner's findings and recommendations as well as the entire record, Mr. Cowell offered to restore Mrs. Fuller to the grade of Dietician III subject to two conditions: (1) that Mrs. Fuller make a written apology to Mrs. Korschun and Mr. John Butterworth, her immediate supervisor, for the bigoted remarks which she made to an employee under her supervision, and (2) that the reduction in salary caused by Mrs. Fuller's demotion to Dietician I, to the date of her reinstatement to Dietician III, be forfeited.
Mrs. Fuller accepted her reinstatement to Dietician III and wrote the required letters of apology. She resisted, however, the disciplinary sanction imposed by Mr. Cowell as to the loss of back pay during her period of demotion. She filed a petition for writ of certiorari to the Circuit Court for the Eleventh Judicial Circuit of Florida and contended in effect that Dade County was barred by the First Amendment to the United States Constitution from disciplining her in any way for making the offensive anti-semitic slurs on the ground that she had a free speech right to make those remarks in the employment context.
The circuit court granted the petition for writ of certiorari, struck the disciplinary sanctions imposed upon Mrs. Fuller, and ordered that she recover any reduction in salary and loss of emoluments of office occasioned by her demotion. The basis for this decision was that Mrs. Fuller had not been found guilty of any actionable misconduct upon which disciplinary sanctions could be imposed. Dade County appeals.

B
The leading and most relevant First Amendment case on the power of the government as an employer to discipline one of its employees for uttering certain speech is Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In that case, a school teacher employed by a township board of education was dismissed from his employment for writing a letter to the editor of the local newspaper which was critical of the school board and the superintendent of schools in their handling of certain proposals to raise new revenue for the schools. The Court struck down the dismissal and articulated the applicable constitutional principles of law governing its decision as follows:
"To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court. (citations omitted). `[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.' (citation omitted). At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." [Emphasis added].
* * * * * *
"Because of the enormous variety of fact situations in which critical statements by teachers and other public employees may be thought by their superiors, against whom the statements are directed *127 to furnish grounds for dismissal, we do not deem it either appropriate or feasible to attempt to lay down a general standard against which all such statements may be judged. However, in the course of evaluating the conflicting claims of First Amendment protection and the need for orderly school administration in the context of this case, we shall indicate some of the general lines along which an analysis of the controlling interests should run.
"An examination of the statements in appellant's letter objected to by the Board reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds between educational and athletic programs, and of both the Board's and the superintendent's methods of informing, or preventing the informing of, the district's taxpayers of the real reasons why additional tax revenues were being sought for the schools. The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among co-workers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can be persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. [Emphasis added].
* * * * * *
"More importantly, the question whether a school system requires additional funds is a matter of legitimate public concern on which the judgment of the school administration, including the School Board, cannot, in a society that leaves such questions to popular vote, be taken as conclusive. On such a question free and open debate is vital to informed decision-making by the electorate. Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.
* * * * * *
"The public interest in having free and unhindered debate on matters of public importance  the core value of the Free Speech Clause of the First Amendment  is so great that it has been held that a State cannot authorize the recovery of damages by a public official for defamatory statements directed at him except when such statements are shown to have been made either with knowledge of their falsity or with reckless disregard for their truth or falsity.
* * * * * *
"In sum, we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Id. at 568, 569-70, 571-72, 573, 574, 88 S.Ct. at 1734, 20 L.Ed.2d at 817, 818, 819, 820, 821.
First Amendment free speech decisional law since Pickering has consistently upheld disciplinary actions by the government as an employer against a public employee for making disparaging remarks on the job which threaten proper supervisory discipline or employee harmony.[2] Although *128 the freedom of speech is a cherished civil liberty in our constitutional system, it is by no means an absolute right. The question in each case is to set a fair balance between the competing individual and governmental interests involved, keeping in mind the core value of the Free Speech Clause of the First Amendment: the promotion of unhindered debate on matters of public importance. Cohen v. California, 403 U.S. 15, 19, 91 S.Ct. 1780, 1785, 29 L.Ed.2d 284, 290 (1971); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); New York Times Co. v. Sullivan, 376 U.S. 254, 269-70, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700-701 (1964); Konigsberg v. State Bar of California, 366 U.S. 36, 49-51, 81 S.Ct. 997, 1005-1007, 6 L.Ed.2d 105, 116 (1961).

C
In the instant case, we deal with a governmental entity, Dade County, which has acted in its capacity as an employer to regulate the speech of one of its employees. As such, Dade County has interests in such regulation that differ significantly from those it possesses when it acts to regulate the speech of the citizenry in general. One of those interests relevant here is the promotion of employee harmony on the job.
Unlike Pickering's letter to the editor of the local newspaper criticizing the township's school board and superintendent of schools with whom he had no regular work contact, Mrs. Fuller's anti-semitic remarks herein were addressed on the job over a sustained period of time to a subordinate Jewish employee with whom Mrs. Fuller had almost daily work contact and with whom it was important that Mrs. Fuller maintain a good working relationship. These comments were insulting to the subordinate employee who became upset and eventually complained to Mrs. Fuller's superiors. As harmonious relationships between Dade County's employees at the hospital were threatened if such insulting speech were to be tolerated, it is our view that Dade County acted well within its authority to promote harmony among its employees when it disciplined Mrs. Fuller for her antisemitic remarks.
It is true, as the hearing examiner found, that Mrs. Fuller's ethnic slurs did not disrupt the work of the dieticians or reduce the efficiency of the dietary staff in connection with the therapeutic patients at the hospital. In other words, work routine of the entire dietician unit at Jackson Memorial Hospital did not break down to the point where patients were not getting their proper food on time. Nonetheless, we believe that Dade County as an employer was not required to wait until things deteriorated to that state before it could take any disciplinary action against Mrs. Fuller. The government has an interest in promoting harmonious employee relationships by prohibiting bickering and petty insults among its employees. No efficient working unit, whether in government or private industry, can tolerate such kind of inexcusable speech among its employees without eventually suffering an impairment in employee morale and in the ultimate quality of its service or product.
It is also true that the hearing examiner expressly declined to determine whether Mrs. Fuller made the insulting, anti-semitic remarks to Mrs. Korschun in jest. Whether made in jest or not, the hearing examiner considered the remarks to be insulting as did Mr. Cowell. In his letter to Mrs. Fuller, Mr. Cowell specifically noted the inappropriateness of the ethnic remarks herein while on the job. While we agree that certain good-humored ethnic comments and jokes are endemic to our culture and should not be regarded as insulting by any reasonable person, it is clear that the remarks herein do not fall in that category. Even so-called jokes of an ethnic nature can have a cutting edge and be most insulting. A delicate question of taste is obviously involved whenever one undertakes to poke *129 fun at another's ethnic origin or religion, which boundary of good taste Mrs. Fuller greatly overstepped.
Nor is it any excuse that Mrs. Fuller may have also been the brunt of similar tasteless and insulting jokes uttered by co-employees concerning her race. As Mrs. Fuller alluded to in her letter of apology, such racist jokes on the job, if any, are equally inappropriate and may also be prohibited by Dade County through the imposition of disciplinary sanctions.

D
Apart from the presence of strong governmental interests in this case, we must also examine the other side of the scale to determine whatever individual interests may be involved in Mrs. Fuller's speech herein which might tip the balance in her favor. We find no such interests in this case. Unlike Pickering's letter to the editor of the local newspaper commenting on the public issue of school financing, Mrs. Fuller's anti-semitic remarks involve an admittedly private matter in which one public employee engaged in ridiculing a co-employee on the job through insulting speech. Such remarks were in no sense directed to any issue of public concern, and accordingly, do not invoke the core value of the Free Speech Clause of the First Amendment as to unhindered debate on issues of public importance. Indeed, Mrs. Fuller makes no contention to the contrary.
As to the individual interest of Mrs. Fuller in expressing her personality as a human being through speech, Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), her anti-semitic insults in this case hardly fall in that category either. No person who utters anti-semitic remarks at the expense of another human being can reasonably claim that it vindicates some distorted notion of individual dignity. On the contrary, such ethnic insults degrade the dignity of both the speaker and the victim of the speech. Sartre, Anti-Semite and Jew (1946).
We agree with Mrs. Fuller that her remarks in this case involved pure speech  which in itself is a form of conduct  and prima facie raise an issue of First Amendment protection. Tinker v. DeMoines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). That alone, however, is insufficient to sustain a free speech claim. It is still necessary to examine the nature of the speech involved and the context in which it was uttered in order to strike a fair balance between the competing governmental and individual interests involved therein. In this case, we conclude that Mrs. Fuller's anti-semitic remarks were not constitutionally protected by the First Amendment because the applicable governmental interests in limiting the speech greatly outweigh whatever minimal individual interests may be involved in allowing the speech.
In all fairness to the trial court, it should be noted that the hearing examiner made certain broad statements of law in his findings which could reasonably be interpreted to mean that Mrs. Fuller's anti-semitic comments were fully protected by the First Amendment. The trial court reasoned quite correctly that if Mrs. Fuller's comments were so protected by the First Amendment, Dade County could not discipline her in any way for the remarks which she made. The trial court, however, was not bound by the conclusion of constitutional law reached by the hearing examiner. Whether the anti-semitic comments herein constituted an expression of free speech guaranteed by the First Amendment is obviously a question of law which could only be determined by the court itself.
In sum, we cannot agree that any of the interests underlying the First Amendment were served by Mrs. Fuller's anti-semitic comments uttered in the employment context against a subordinate employee with whom she had daily work contact, or that Dade County was disabled by those interests from imposing and enforcing the very limited discipline emerging from this record. The applicable decisional law demonstrates that although a public employee has a First Amendment right of free *130 speech, the right is not an absolute one. The government as an employer has a legitimate interest in limiting certain employee speech on the job for the purpose of promoting harmonious relationships between its employees. Mr. Cowell's decision to impose limited disciplinary sanctions against Mrs. Fuller for her anti-semitic remarks was clearly aimed at promoting such harmonious relationships among employees at Jackson Memorial Hospital. In such action, we can find no violation of Mrs. Fuller's First Amendment rights.
The order under review is reversed and the cause is remanded to the trial court with directions to deny Mrs. Fuller's petition for a writ of certiorari and to reinstate Mr. Cowell's disciplinary action against Mrs. Fuller.
NOTES
[1] "Chapter X, Sec. 6  Personnel Rules for the Public Health Trust of Dade County, Florida:

Section 6. Cause for Disciplinary Action: While charges may also be based on causes other than those here enumerated, the following are declared to be cause for reprimand, suspension without pay, demotion or dismissal:
* * * * * *
(B) Rude, antagonistic or offensive conduct towards supervisors, fellow employees, patients or to the public.
* * * * * *
(H) Conduct unbecoming an employee of the Trust whether on or off duty."
[2] Byrd v. Gain, 558 F.2d 553 (9th Cir.1977) (written reprimand to personnel files of two police officers for publicly hectoring their department and superior officers was upheld); Sprague v. Fitzpatrick, 546 F.2d 560 (3d Cir.1976) (dismissal of an assistant district attorney with administrative responsibilities in a prosecutor's office for making a public statement that his immediate supervisor had not told the truth on a certain matter was upheld); Kannisto v. City and County of San Francisco, 541 F.2d 841 (9th Cir.1976) (15 day suspension of a police lieutenant for making disrespectful and disparaging remarks about a superior officer while addressing his subordinates during a morning inspection was upheld); Rosemon v. Indiana University of Pennsylvania, 520 F.2d 1364 (3d Cir.1975) (refusal of a university to renew a non-tenured associate professor's teaching contract for attacking the integrity of the chairman of her department at a departmental staff meeting was upheld).