Eleanor **ROSEMAN**, Appellant,

v.

**INDIANA UNIVERSITY OF PENN-SYLVANIA, AT INDIANA et al.**

No. 74–2201.

United States Court of Appeals, Third Circuit.

Argued May 2, 1975.

Decided July 22, 1975.

 

David Rudovsky, Kairys & Rudovsky, Philadelphia, Pa., for appellant.

Patricia Donovan, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., for appellees.

Before FORMAN, VAN DUSEN and GARTH, Circuit Judges.

1. In other counts, plaintiff's complaint stated pendent state law claims. The district court's determination of these claims has not been challenged on appeal.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This is a timely appeal from a September 24, 1974, judgment of the United States District Court for the Western District of Pennsylvania. The plaintiff, Roseman, was an associate professor in the Foreign Languages Department of Indiana University of Pennsylvania for the academic years beginning September of 1969 and 1970. Her contract was not renewed for the academic year beginning in September of 1971. Her complaint, filed December 20, 1973, alleged that the non-renewal violated her right to a pre-termination hearing, was in retaliation for her exercise of protected speech, and penalized her for her religious beliefs.[1] She sought reinstatement, injunctive relief, and damages. The district court found for the defendants on all counts. *Roseman v. Hassler,* 382 F.Supp. 1328, 1341–42 (W.D.Pa.1974). We affirm.

■ It will be unnecessary to restate the facts relevant to those claims in which we have no disagreement with the district court's opinion.[2] In particular, we find that as Pennsylvania contract law and Indiana University's tenure regulations apply to the plaintiff's negotiations with the University, she had no property interest in continued employment sufficient to require a pre-termination hearing under *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). We so find for the reasons stated by the district court. 382 F.Supp. at 1335–37, 1342 (Conclusions of Law 2–4). See also *Skehan v. Board of Trustees,* 501 F.2d 31 (3d Cir. 1974), *vacated and remanded on other grounds,* 421 U.S. 983, 95 S.Ct. 1986, 44 L.Ed.2d 474 (1975). We also affirm the district court's holding that the plain-

2. The background facts are fully set forth in the district court opinion at 382 F.Supp. 1328. See, for example, findings 10–26, 33–55, at pages 1330–32 of 382 F.Supp.

tiff's First Amendment right to practice her religion freely was not violated.[3]

The plaintiff's freedom of speech claim requires somewhat more extended discussion. The Committee on Merit and Tenure of the Faculty evaluated the plaintiff's performance at a meeting on March 20, 1970, and called several shortcomings to the plaintiff's attention. The Committee indicated at that time that it would meet again for a further discussion of the non-tenured staff. Shortly thereafter, a controversy arose within the Foreign Languages Department. Plaintiff apparently thought that Faust, the Acting Chairman of the Foreign Languages Department and a defendant in this action, may have suppressed the application of one Hyde for chairmanship of the Department. The district court found that Faust had committed no impropriety.[4] The Findings (37–40 are set forth in note 5 below)[5] indicate that plaintiff never made an investigation of the facts and her complaint was first made after the deadline for receiving applications had passed. Notwithstanding, on April 5, 1970, the plaintiff complained to the Dean of the College of Arts and Sciences of the University, McGovern, about what she believed to have been Faust's wrongful suppression of the Hyde application, and later repeated these charges at a May 5, 1970, meeting of the teaching staff of the Foreign Languages Department at the invitation of Dean McGovern, who specifically invited the plaintiff to explain them.[6] She did so; the faculty nevertheless gave a vote of confidence to Faust. On May 12, the Committee on Merit and Tenure, of which Faust was a member decided not to renew the plaintiff's contract by a vote of ten affirmatives and one abstention. This decision was subsequently ratified by University officials.

■ The district court expressed concern, which we share, over the "close proximity of the meeting of May 12, 1970, to the faculty meeting of May 5, 1970, at which plaintiff had voiced her complaints as to Mr. Faust." 382 F.Supp. at 1338–39. The district court found, however, that "there were adequate work-related reasons for not renewing plaintiff's contract," which lan-

---

**3.** In particular, we rely on Findings of Fact 27, 28, 31, 32, 33 and 34, which establish that the anti-semitism reflected in plaintiff's Exhibits 14, 15 and 17 played no part in the non-renewal decision. These Findings were not clearly erroneous under F.R.Civ.P. 52. See note 7 below. See also 382 F.Supp. at 1337–38.

**4.** At p. 20 of her appeal brief, the plaintiff recounts certain facts which suggest that Faust had committed an impropriety. However, she has not asked us to set aside as clearly erroneous the district court's finding that there was no impropriety, and we specifically decline to do so. We therefore accept as fact the district court's finding that her accusations of impropriety were erroneous. Finding of Fact 36 reads as follows:

"36. Plaintiff's conduct seriously impaired the orderly functioning of the chairmanship screening committee."

**5.** "37. Defendant Faust had turned over the application in question to Dr. Op De Beeck, in the normal manner, thus committing no improprieties.

"38. The screening committee deadline for applications for chairman was tentatively March 31, 1970.

"39. The Hyde Application in question was received after the deadline on April 10, 1970.

"40. Plaintiff had never specifically asked Mr. Faust about the Hyde application from April 10, 1970, until she stepped forward at the department meeting on May 5, 1970, at the invitation of Dean McGovern."
382 F.Supp. at 1331–32.

**6.** In her appeal brief at p. 21, the plaintiff asserts that in connecting her with the accusations against Faust, McGovern broke a promise to "keep her 'name out of the matter.'" The district court did not find that such a promise had been made, and whether or not such a promise was made and broken has no effect upon our decision. Finding 36, quoted in note 4, shows that plaintiff's conduct "seriously impaired the orderly functioning of . . . [a University] committee." However, that such an imbroglio should even be brought to the attention of federal courts exemplifies the private nature of the events relevant to the plaintiff's freedom of speech claim, and reinforces our determination that such matters are better left to the parties involved, without interference from such courts. See note 13 below.

guage is supported by Findings 34 and 45 (382 F.Supp. at 1331 and 1332), reading as follows:

"34. Plaintiff was non-renewed because of her work practices which created administrative hardships and delays, her inadequate classroom performance and her failure to get along amicably in the department.

. . . . .

"45. The decision to non-renew plaintiff was not made in retaliation for the exercise of any valid right of free speech."

■ The district court also reasoned that "plaintiff has the burden of proving by a preponderance of the evidence that her non-retention was caused in substantial part by restraint on her freedom of speech . . .." 382 F.Supp. 1339. In this respect, the district court appears to have misunderstood the proper standard of review where a public employee alleges that his employment has been terminated in retaliation for the exercise of protected speech. It is not enough merely to find that other grounds were adequate for the discharge, or that retaliation did not constitute a substantial part of the reason for the discharge. Instead, the plaintiff need only prove that the discharge was "predicated even in part on his exercise of first amendment rights." *Skehan, supra* at 39; *Simard v. Board of Education,* 473 F.2d 988, 995 (2d Cir. 1973).[7]

■■ The district court's use of the wrong standard of review would require us to remand for further consideration were it not for a second rationale on which the district court rested its decision. That is the court's finding that the plaintiff's communications to McGovern and at the faculty meeting were not pro-

tected by the First Amendment, and therefore might permissibly form part of the basis for the plaintiff's discharge.

The parameters defining protected speech for state employees[8] were set forth by the Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "The problem in any case," the Court said, "is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734. The communication for which Pickering, a high school teacher, had been discharged was a letter written to a "local newspaper in connection with a recently proposed tax increase." *Id.* at 564, 88 S.Ct. at 1733. Pickering's letter "was critical of the way in which the Board [of Education] and the district superintendent of schools had handled past proposals to raise new revenue for the schools." *Id.* The Court found some of the statements in Pickering's letter to be true and others, while not malicious, to be false, but it found all of them to be protected:

"What we do have before us is a case in which a teacher has made erroneous public statements upon issues then currently the subject of public attention, which are critical of his ultimate employer but which are neither shown nor can be presumed to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally. In these circumstances we conclude that the interest of the school administration in limiting

---

7. The same standard applies to the plaintiff's allegation that her employment was terminated on the basis of an anti-semitic bias and in retaliation for her religious observances. The district court's statement that the plaintiff must prove by a preponderance of the evidence "that such bias caused her discharge," 382 F.Supp. at 1337, fails to indicate that proof of causation *in part* would suffice. Although

the district court's statement of the rule is thus ambiguous, the court's findings of fact support affirmance under the "in part" standard. See note 3, *supra.*

8. That the plaintiff is a state employee, and that the University's action in terminating her employment was under color of law for purposes of 42 U.S.C. § 1983, are not contested in this appeal.

teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public."

*Id.* at 572–73, 88 S.Ct. at 1737 (footnote omitted).

The communications made by the plaintiff in the case before us differ from Pickering's in two crucial respects. In the first place, Roseman's expressions were essentially private communications in which only members of the Foreign Languages Department and the Dean of the College of Arts and Sciences were shown by the plaintiff to have had any interest. Pickering's letter to the editor, urging the electorate with respect to a pending tax proposal, was, by contrast, a classic example of public communication on an issue of public interest. In *Pickering*,[9] as in other cases,[10] the Supreme Court inquired into the public nature of a communication in determining the degree of First Amendment protection. As Roseman's communications were made in forums not open to the general public and concerned an issue of less public interest than Pickering's, the First Amendment interest in their protection is correspondingly reduced.[11]

The second respect in which Roseman's communications differ from Pickering's is in their potentially disruptive impact on the functioning of the Department. Pickering's attacks were on a remote superintendent and school board; in contrast, Roseman's called into question the integrity of the person immediately in charge of running a department which, it is fair to assume, was more intimate than a school district. The district court found that "plaintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers." 382 F.Supp. at 1339. In making this finding, the district court reflected a similar concern expressed by the Supreme Court, which noted that Pickering's statements were "in no way directed towards any person with whom [Pickering] would normally be in contact in the course of his daily work as a teacher." *Pickering, supra,* 391 U.S. at 569–70, 88 S.Ct. at 1735. Because of this, Pickering's case raised "no question of maintaining either discipline by immediate superiors or harmony among co-workers." *Id.* at 570, 88 S.Ct. at 1735. The same obviously cannot be said of Roseman's faculty meeting accusations

**9.** The Supreme Court's opinion in Pickering leaves no doubt that the public nature of his communication was a central consideration in reaching its conclusion that the communication was protected. The Court observed that Pickering's accusations reflected "a difference of opinion between Pickering and the Board as to the preferable manner of operating the school system, a difference of opinion that clearly concerns an issue of general public interest." *Pickering, supra* at 571, 88 S.Ct. at 1736. The Court argued that "the question whether a school system requires additional funds is a matter of legitimate public concern," and said that "[o]n such a question free and open debate is vital to informed decision-making by the electorate." Id. at 571–72, 88 S.Ct. at 1736. Since teachers are the class of citizens likely to have informed opinions on the question, the Court believed that "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Id.* at 572, 88 S.Ct. at 1736. In concluding, the Court again referred to the "public interest in having free and unhindered debate on matters of public importance" as "the core

value of the Free Speech Clause of the First Amendment." *Id.* at 573, 88 S.Ct. at 1737.

**10.** See, *e. g., Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974); *Gertz v. Welsh,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**11.** Thus, if Roseman's communications to McGovern and at the faculty meeting had been on issues of public interest, or if she had convinced local news media that her grievance against Faust was newsworthy, entirely different considerations would come into play. See, *e. g., Acanfora v. Board of Ed.,* 491 F.2d 498, 500–01 (4th Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974) (school teacher transferred to a non-teaching position because of his homosexuality may grant public media interviews discussing his transfer with First Amendment protection). See generally cases cited in note 10, *supra.*

directed at the Acting Chairman of her Department.[12]

For reason of these distinctions between the plaintiff's communications and the communications at issue in *Pickering,* we have concluded that the plaintiff's communications fall outside the First Amendment's protection. Because they do, the University did not deny the plaintiff her First Amendment rights, even if it considered her statements in making its non-renewal decision.[13]

Accordingly, the judgment of the district court will be affirmed. The costs shall be taxed against the appellant.[14]

---

12. While Roseman's communications differ from Pickering's in terms of public interest and potentially disruptive impact, both bear approximately the same relation to the truth. Both were erroneous, see *Pickering, supra* at 578–82, 88 S.Ct. 1731 (App.); note 4, *supra,* but neither was found to have been malicious or issued in reckless disregard for the truth. Thus, both statements probably reflected good faith error. See *Pickering, supra* at 582, 88 S.Ct. 1731.

13. The trade-off between vigorous intra-departmental debate and the harmonious atmosphere essential to academic pursuits is a matter of departmental, not constitutional, concern. Also, we note that there were other substantial reasons for non-renewal in this case. See Findings cited in note 2 above.

14. Because of our holdings on the plaintiff's First Amendment and due process claims, we do not reach the questions of sovereign immunity and availability of damages against the individual defendants which were discussed by the district court, 382 F.Supp. at 1333–35.