William **HOOPES**

v.

The **CITY OF CHESTER**, a Municipal Organization, John H. Nacrelli, Individually and as Mayor of the City of Chester and President of the City Council of the City of Chester, Clinton L. Johnson, Michael D. Macneilly, Alexander V. Osowski and James L. Sharp, Each Individually and as Councilmen of the City of Chester, the City Council of the City of Chester.

Civ. A. No. 79–1246.

United States District Court, E. D. Pennsylvania.

July 23, 1979.

Walter I. Breslin, Ridley Park, Pa., for plaintiff.

Arthur Levy, Chester, Pa., for defendants.

## MEMORANDUM

LUONGO, District Judge.

William J. Hoopes filed the complaint in this civil rights action on April 4, 1979. Hoopes, who formerly served as Chief of Police of the City of Chester, Pennsylvania, alleges that he was demoted to the rank of Inspector solely because he cooperated with federal law-enforcement authorities in the investigation and prosecution of John H. Nacrelli, the former Mayor of Chester. The complaint seeks damages under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(c) (1976). Hoopes also asserts a pendent claim under Pennsylvania libel law. Defendants are the City of Chester (a city of the third class under Pennsylvania law), John H. Nacrelli (sued individually and as Mayor and President of the City Council of Chester), Clinton L. Johnson, Michael D. Macneilly, Alexander V. Osowski, and James L. Sharp (sued individually and as councilmen of the City of Chester), and the City Council of the City of Chester. Presently before me is defendants' motion to

**1216**

dismiss the complaint for failure to state a claim upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). For the reasons hereafter stated, I conclude that the motion should be granted in part and denied in part.

The complaint alleges the following facts, which are taken as true for the purposes of this motion. *See, e. g., Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); 2A Moore's Federal Practice ¶ 12.08 at 2266–67 (2d ed. 1948). "Prior to November 9, 1978, plaintiff was the Chief of Police of the City of Chester." Complaint (Document No. 1) ¶ 11. At some point in 1977, defendant Nacrelli, who was then Mayor of the City of Chester, "became the subject of a criminal investigation by the federal government." *Id.* ¶ 12. Plaintiff cooperated with the federal authorities who conducted this investigation. *Id.* As a result of the investigation, a federal grand jury in the Eastern District of Pennsylvania indicted Nacrelli in 1978 on charges of "bribery, conspiracy, racketeering, income tax evasion and other crimes." *Id.* ¶ 13. The case, docketed as Criminal No. 78–165, was assigned to the Honorable Raymond J. Broderick.

"15. During the course of this investigation, and both prior to and subsequent to the indictment of the Defendant Nacrelli, the defendants conspired with each other to deprive the plaintiff of his Constitutional rights by engaging in a campaign through a series of letters exchanged, and otherwise, giving the plaintiff directives under force of law to investigate certain allegations that had reference to the investigation, and further, the said defendants interrogated plaintiff under the guise of conducting their own investigation and demanded that plaintiff provide defendants with information that had been uncovered during the investigations into the activity of the Defendant Nacrelli in an effort to compromise and jeopardize [plaintiff's] role in the aforesaid [federal] investigation, and further, with the intention to interfere in that investigation and deprive the plaintiff of

and chill the exercise of his First Amendment rights . . . specifically, plaintiff's right to testify.

16. As a result of the aforesaid investigation conducted by the defendants, at a time when the above-mentioned federal investigation was occurring, plaintiff was torn between his obligations as Chief of Police of the City of Chester and his obligations as a component part of the aforesaid Federal investigation into the activity of Defendant Nacrelli.

17. The defendants' efforts towards eliciting information concerning the federal investigation from plaintiff was [*sic*] designed to make it difficult for plaintiff to continue his part in the federal investigation, and further, was [*sic*] designed to discover the federal case against Defendant Nacrelli, all of which activity on the part of defendants resulted in plaintiff being placed in a position where his Constitutional rights, as aforesaid, were violated.

18. During the course of defendants' investigation of plaintiff's activities, special independent counsel was engaged by the defendants to assist in the defendants' investigation of plaintiff, and to make a final report to defendants. In that final report, special counsel filed his report that no action be taken against plaintiff inasmuch as plaintiff acted in good faith in cooperating with other law enforcement agencies and officials. The said report was dated May 31, 1978.

19. Notwithstanding the written report filed by special independent counsel, the defendants continued to persist in extracting from plaintiff further evidence of the government's case against the defendant Nacrelli and directed plaintiff to again commence an extensive investigation designed to frustrate the plaintiff's position in reference to the ongoing federal investigation, and to further obtain discovery of the federal criminal case against Defendant Nacrelli."

In September of 1978, the Government presented its case against Nacrelli to the jury in a lengthy trial. Hoopes "was called

upon to testify and did testify on behalf of the government on September 21, 1978, and September 22, 1978" at this trial. *Id.* ¶ 20. The jury failed to agree on a verdict, however, and Judge Broderick then declared a mistrial. *Id.* Nacrelli later discharged plaintiff as Chief of Police, and demoted him to the rank of inspector, by letter dated November 9, 1978. Exhibit A to Complaint. Nacrelli took this action solely because plaintiff had cooperated with the federal investigators and had testified as a prosecution witness during the trial. Complaint ¶ 21. At this point, William Hamilton became the Acting Chief of Police. *Id.* ¶ 23.

In January of 1979, the Government presented its case against Nacrelli during a second trial, during which "plaintiff again testified for the government." *Id.* ¶ 22. *See generally United States v. Nacrelli,* 468 F.Supp. 241, 244–47 (E.D.Pa.1979). At the close of this trial, the jury returned a verdict of guilty on all counts. Complaint ¶ 22. On March 21, 1979, defendant City Council of the City of Chester "made William Hamilton the permanent Chief of Police and failed to restore plaintiff to that position." *Id.* ¶ 23. Hoopes then filed this complaint on April 4, 1979.

The complaint asserts two distinct claims for damages. First, Hoopes contends that defendants demoted him solely because he cooperated with the federal investigators and testified as a prosecution witness at Nacrelli's trial. As this activity fell within the first amendment guarantee of freedom of expression, Hoopes argues, defendants acted unlawfully when they demoted him in retaliation for that activity, and they are therefore liable under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985(c) (1976). Hoopes also asserts a pendent state-law tort claim. In this connection, he urges that Nacrelli's letter of November 9, 1978, which allegedly gave false and defamatory rea-

sons for Nacrelli's decision to demote Hoopes, was libelous under Pennsylvania law. Complaint ¶ 32–40.

Defendants seek dismissal of the entire complaint. They advance a number of separate arguments, some of which apply only to certain defendants. I shall consider each of defendants' contentions in turn.

▮ Initially, all defendants move to dismiss Hoopes' claim under 42 U.S.C. § 1985(c) (1976). As they quite properly point out, section 1985(c) imposes liability only where there is "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971) (footnote omitted); *see, e. g., Carchman v. Korman Corp.,* 594 F.2d 354 (3d Cir. 1979) (per curiam), *petition for cert. filed,* 48 U.S.L.W. 3001 (U.S. June 25, 1979) (No. 78–1909); *Novotny v. Great Am. Fed. Sav. & Loan Ass'n,* 584 F.2d 1235, 1240–41 (3d Cir. 1978) (en banc), *rev'd on other grounds,* 442 U.S. ——, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Defendants also note, again quite properly, that Hoopes' complaint alleges no such animus. Plaintiff concedes as much, and asserts that he is "willing to enter into a voluntary dismissal" of the section 1985(c) claim under Rule 41(a)(1). Plaintiff's Brief in Opposition (Document No. 6) at 18. Such a dismissal, by the terms of Rule 41(a)(1), would ordinarily be without prejudice. At oral argument, however, plaintiff's counsel conceded that the complaint clearly fails to state a claim under section 1985(c), and that it could properly be dismissed under Rule 12(b)(6). Accordingly, rather than waiting for plaintiff to effect a voluntary dismissal under Rule 41(a)(1), I shall simply enter an order dismissing this claim under Rule 12(b)(6).

▮ Defendants' remaining arguments, with one exception,[1] are directed at Hoopes'

---

1. Defendants also contend that Hoopes' pendent libel claim should be dismissed for lack of subject-matter jurisdiction. This argument rests on the premise that Hoopes' federal civil rights claim should be dismissed under Rule 12(b)(6). In my view, the federal claim may

not properly be dismissed at this time. However, I shall exercise my discretion and decline to exercise jurisdiction over Hoopes' libel claim. It appears that this claim will turn on factual and legal issues quite different from those raised by Hoopes' federal civil rights

section 1983 claim. Defendants contend, first of all, that Hoopes was deprived of neither "property" nor "liberty," within the meaning of the fourteenth amendment, so that his section 1983 claim cannot rest on an alleged deprivation of any rights secured to him by the fourteenth amendment. This argument is largely beside the point. Hoopes fully concedes that, under state law, Nacrelli was free to demote him at any time, with or without cause, and that he had no "property" interest in his position as Chief of Police. *See* Pa.Stat.Ann., tit. 53, § 37002 (Purdon Supp.1979) (Third Class City Code). Nor does Hoopes argue that defendants deprived him of a "liberty" interest in reputation without affording him procedural due process. *See generally Paul v. Davis,* 424 U.S. 693, 701–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Rather, Hoopes relies on the due process clause of the fourteenth amendment only because it incorporates the first amendment guarantee of freedom of expression, thereby limiting the power of state and local officials to impinge upon protected speech or expression. *See, e. g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 749 n. 1, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Thus, although Hoopes could have been demoted for no reason at all, and although he was not entitled to a hearing in connection with his demotion, his rights may nevertheless have been violated if, as he alleges, the decision to demote him was made because he engaged in constitutionally protected expression. *See Mount Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Perry v. Sindermann,* 408 U.S. 593, 596–98, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

◼ The question, then, is whether Hoopes was demoted because he engaged in protected speech or expression. I have little difficulty with the notion that a member of the *general public* who assists in a federal criminal investigation, and then testifies as a prosecution witness at the trial, is

engaging in activity that is protected by the first amendment. Indeed, defendants do not dispute this point. It is clear, however, that public employees enjoy a somewhat narrower range of protected expression than do members of the general public. *See, e. g., Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Gasparinetti v. Kerr,* 568 F.2d 311, 315 (3d Cir. 1977), *cert. denied,* 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978); *Sprague v. Fitzpatrick,* 546 F.2d 560 (3d Cir. 1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977); *Kannisto v. City and County of San Francisco,* 541 F.2d 841 (9th Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977). Defendants urge that Hoopes, as a public employee, may not claim the protection of the first amendment in the particular factual context of this case. I shall now proceed to address that contention.

◼ The Supreme Court has adopted "a broad balancing test as the controlling constitutional doctrine" in this area. T. Emerson, The System of Freedom of Expression 581 (1970). In order to determine whether a public employee's speech or expression is protected by the first amendment, a court must weigh "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *see Givhan v. Western Line Consol. School Dist.,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Mount Healthy City Bd. of Educ. v. Doyle,* 429 U.S. 274, 284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See also* Z. Chafee, Free Speech in the United States 553–54 (1941). The Supreme Court first articulated this test in the *Pickering* case, and it has not had occasion to apply the test in any

claim, and this divergence, in my view, counsels against entertaining both claims in this

action. Accordingly, I shall enter an order dismissing the pendent claim.

subsequent decision. Thus, *Pickering* is a suitable point of departure here.

Professor Emerson has summarized the case as follows:

"Pickering, a high school teacher in Illinois, was dismissed by the Board of Education for writing a letter sharply critical of the administration of the school system to a local newspaper. The letter was written after several proposals made by the Board to raise additional funds through bond issues had been defeated by the voters of the town, and after various letters supporting the bond issues had been published in the newspaper by other teachers and by the Superintendent of Schools. Pickering's letter constituted a detailed attack upon various actions of the Board, particularly its allocation of funds to the school's athletic as opposed to its educational program. It also charged that the Superintendent of Schools had stated that 'any teacher that opposes the referendum should be prepared for the consequences' and described the atmosphere at the school as 'totalitarianism.' The Board charged that there were eight statements in the letter which were false, but the Supreme Court's review of the record reduced these to four. The most important of the factual errors was a statement by Pickering that the Board was spending fifty thousand dollars a year on transportation for athletes, whereas the correct figure was ten thousand dollars. The Board, after hearing, dismissed Pickering on the ground that publication of his letter was 'detrimental to the efficient operation and administration of the schools of the district.' The Supreme Court . . . held that the dismissal violated Pickering's First Amendment rights."

T. Emerson, The System of Freedom of Expression 579 (1970) (footnote omitted).

The *Pickering* opinion, as Professor Emerson has noted, "ultimately seems to rest upon those considerations relevant to the question whether the publication of Pickering's letter was incompatible with his commitments as an employee in the school system." *Id.* 581. *See Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 414–415 n. 3, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Thus, the Court noted that the sentiments voiced in the letter were not directed towards anyone with whom Pickering "would normally be in contact in the course of his daily work as a teacher," 391 U.S. at 569–70, 88 S.Ct. at 1735, so that the case presented "no question of maintaining either discipline by immediate superiors or harmony among co-workers." *Id.* at 570, 88 S.Ct. at 1735. The letter, although critical of Pickering's "ultimate employer"—the School Board—did not appear "to have in any way either impeded the teacher's proper performance of his daily duties in the classroom or to have interfered with the regular operation of the schools generally." *Id.* at 572–73, 88 S.Ct. at 1737 (footnote omitted). The Court also observed that Pickering's job was not one of those "positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them." *Id.* at 570 n. 3, 88 S.Ct. at 1735 n. 3. If an employee who held such a position were to be discharged for public criticism that assertedly undermined the "personal and intimate" relationship between him and his superior, then his case would involve "significantly different considerations" than those raised by Pickering's dismissal. *Id.*

The Court of Appeals for the Third Circuit has applied the *Pickering* balancing test in two cases; each time, it held that the employee's statements were not protected by the first amendment. In *Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976), a professor of foreign languages contended that the decision not to renew her contract was made in retaliation for

certain protected speech.[2] The court of appeals summarized the case in this fashion: "The Committee on Merit and Tenure of the Faculty evaluated the plaintiff's performance at a meeting on March 20, 1970, and called several shortcomings to the plaintiff's attention. The Committee indicated at that time that it would meet again for a further discussion of the non-tenured staff. Shortly thereafter, a controversy arose within the Foreign Languages Department. Plaintiff apparently thought that Faust, the Acting Chairman of the Foreign Languages Department . . . may have suppressed the application of one Hyde for chairmanship of the Department. . . . [P]laintiff never made an investigation of the facts and her complaint was first made after the deadline for receiving applications had passed. Notwithstanding, "on April 15, 1970" the plaintiff complained to the Dean of the College of Arts and Sciences of the University, McGovern, about what she believed to have been Faust's wrongful suppression of the Hyde application, and later repeated these charges at a May 5, 1970, meeting of the teaching staff of the Foreign Languages Department at the invitation of Dean McGovern, who specifically invited the plaintiff to explain them. She did so; the faculty nevertheless gave a vote of confidence to Faust. On May 12, the Committee on Merit and Tenure, of which Faust was a member decided not to renew the plaintiff's contract by a vote of ten affirmatives and one abstention. This decision was subsequently ratified by University officials."

520 F.2d at 1366 (footnotes omitted).

After an evidentiary hearing, the district court made its findings and conclusions, and entered judgment in favor of the defendants. The court of appeals affirmed this judgment. Judge Van Dusen, writing for the panel, found the case easily distinguishable from *Pickering*. Unlike Pickering's letter to the editor, which concerned an issue of public interest, "Roseman's expressions were essentially private communications in which only members of the Foreign Languages Department and the Dean of the College of Arts and Sciences were shown . . . to have had any interest." *Id.* at 1368.[3] Moreover:

"The second respect in which Roseman's communications differ from Pickering's is in their potentially disruptive impact on the functioning of the Department. Pickering's attacks were on a remote superintendent and school board; in contrast, Roseman's called into question the integrity of the person immediately in charge of running a department which, it is fair to assume, was more intimate than a school district. The district court found that 'plaintiff's attacks upon Faust's integrity in a faculty meeting would undoubtedly have the effect of interfering with harmonious relationships with plaintiff's superiors and co-workers.'"

520 F.2d at 1368 (citation omitted).

Thus, the panel concluded that Roseman's statements were not protected by the first amendment.

In *Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977), the former First Assistant District Attorney of Philadelphia County asserted that the District Attorney had discharged him for making certain statements to a newspaper reporter. The district court, after directing

---

2. The plaintiff in *Roseman* also raised a free exercise claim. The district court rejected this claim after taking evidence, and the court of appeals affirmed this holding based on the trial court's findings of fact. *Roseman v. Hassler*, 382 F.Supp. 1328, 1337–38 (W.D.Pa.1974), *aff'd sub nom. Roseman v. Indiana University of Pa.*, 520 F.2d 1364, 1365–66 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976).

3. The panel's conclusion that Roseman's statements were entitled to less protection because they "were made in forums not open to the general public," 520 F.2d at 1368, is no longer tenable in light of *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979).

the parties to file affidavits bearing on the nature of their working relationship, dismissed Sprague's complaint, and the court of appeals affirmed the dismissal. Briefly, the case arose over public statements regarding Fitzpatrick's official conduct. District Attorney Fitzpatrick had repeatedly denied any responsibility for formulating a controversial sentencing recommendation; Sprague, in a published newspaper interview, "sharply disputed the truth of each" of Fitzpatrick's statements. 546 F.2d at 562. Judge Hunter, writing for the appellate panel, discussed both *Pickering* and *Roseman* in explaining why Sprague's statements were not protected by the first amendment:

"The case *sub judice* presents an even more egregious example of disruptive impact. The [district court] found it 'beyond question' that Sprague's statements had 'totally precluded any future working relationship between him and the defendant . . . .' The First Assistant District Attorney—'alter ego' of the District Attorney, his direct administrative and policy-making subordinate—declared in public that his immediate superior had not told the truth. The irreparable breach of confidence between the two men is evidenced by Fitzpatrick's immediate dismissal of Sprague and Sprague's failure to seek reinstatement as a form of relief in this action. Certainly we could not expect a district attorney to run an efficient office if his first assistant were free to impugn his integrity in public.

It is true that Sprague's interview, in contrast to Roseman's criticisms, concerned matters of grave public import. But this does not tilt the *Pickering* balance in favor of first amendment protection where, as here, the effectiveness of the employment relationship between employee-speaker and employer-target is so completely undermined. Indeed, the public uproar engendered by Sprague's pronouncements is precisely the factor that so thoroughly curtailed Sprague's usefulness as Fitzpatrick's deputy. *Roseman* did not hold that the public importance of an employee's statements automatically created first amendment protection. Instead, that importance may be, *mutatis mutandis*, one of the factors to be weighed in favor of protecting the employee-citizen's right to speak on matters of general concern. The key question under *Pickering*, however, is whether the employment relationship has been seriously undermined. If the arousal of public controversy exacerbates the disruption of public service, then it weighs against, not for, first amendment protection in the *Pickering* balance."

546 F.2d at 565–66 (footnote and citations omitted).

Defendants here rely heavily upon *Sprague*. Their argument is as follows:

"The Mayor's removal of the plaintiff as Chief is . . . justified by the fact that the effectiveness of the relationship between superior and subordinate is completely undermined. Even where the plaintiff's action and statements may be of public import, the right of the superior in this type of situation to dismiss a subordinate prevails over any constitutional protections. The instant case is even stronger than the *Sprague* case in that the Mayor did not dismiss the plaintiff but merely removed him as Chief and restored him to the same position that he held before the Mayor designated him as Chief.

The working relationship between the Mayor and the Chief of Police is one in which personal loyalty and confidence are necessary to the proper functioning of the police department. The plaintiff was employed at this highest level of the police department. His immediate superior was the Mayor, who is given the authority and duty to supervise the police department under the Third Class City Code. The significance and importance of this relationship is borne out by the fact that the statute gives the Mayor the exclusive authority to designate the Chief and to remove him. It must be undisputed that good relations between the Mayor

and Chief are critical to the effective operation of the police department."

Defendants' Brief (Document No. 3) at 9–10 (citation omitted).

Although defendants' legal argument may have merit, I cannot dismiss Hoopes' free speech claim at this time. As matters now stand, defendants simply have not supplied the necessary factual predicate for such a dismissal.

Two related factual issues are involved here. First, defendants assert (in their brief) that the working relationship between the Mayor of Chester and the Chief of Police requires both "personal loyalty and confidence." As I understand their argument, they contend that Hoopes' job was one of those jobs that the *Pickering* Court described as "positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticisms of the superior by the subordinate would seriously undermine the effectiveness .of the working relationship between them." 391 U.S. at 570 n. 3, 88 S.Ct. at 1735 n. 3. They may well be correct on that score. But they have presented no facts that would enable me to evaluate the working relationship between the Mayor and the Chief of Police. Thus, this case stands on a different footing than the *Sprague* case, where Judge Ditter had before him affidavits describing the working relationship between the District Attorney and the First Assistant District Attorney. *See* 412 F.Supp. 910, 918–19 nn. 28–29 (E.D.Pa.), *aff'd*, 546 F.2d 560 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977). Defendants ask me to accept their characterization of the working relationship involved in this case based on certain provisions of the Third Class City Code. The Code, which the parties agree applies to the City of Chester, provides that "[t]he mayor shall exercise a constant supervision and control over [the] conduct [of the police]." Pa.Stat.Ann., tit. 53, § 37007 (Purdon 1957). The Mayor is directed to designate from the police force all officers, including the Chief of Police, and the Chief

may also be "demoted without cause" by the Mayor. *Id.* § 37002 (Purdon Supp.1979). Although these provisions certainly shed some light on the relationship between the Mayor of Chester and the Chief of Police, they do not demonstrate that the relationship is "of such a personal and intimate nature" that public criticism by the subordinate cannot be tolerated. In the present factual vacuum, I cannot determine whether the relationship falls within that description.

Defendants also suggest that Hoopes' statements "completely undermined" the working relationship between him and Nacrelli. Under *Pickering* that disruptive effect would take Hoopes' statements outside the shelter of the first amendment even if the working relationship between Hoopes and Nacrelli were *not* of the exceptional kind just discussed. Again, however, the necessary factual predicate is missing. I have before me no affidavits or other materials that address the effects of Hoopes' statements on his working relationship with Nacrelli. Hoopes' failure to seek reinstatement here, standing alone, does not establish that his working relationship with Nacrelli was damaged beyond repair. Nor can I infer a disruptive effect from the very nature of the statements, as the district court apparently did in *Roseman, supra*, for the complaint, which is all that I have before me, gives me no idea at all of the content of Hoopes' statements. If defendants wish to pursue their contention that those statements "completely undermined" his working relationship with Nacrelli, perhaps the appropriate course of action would be for them to submit a copy of the transcript of Hoopes' testimony at the first trial.

In short, although defendants' reliance upon *Sprague* may provide a basis for granting summary judgment once a factual record has been created, I cannot say at this time that Hoopes' statements are beyond the reach of the first amendment protection afforded public employees.

Plaintiff seemingly acknowledges that the *Pickering* doctrine may not protect him

once an adequate factual record is compiled here, for he argues that his conduct, even if it disrupted working relations between himself and the Mayor, "was for the betterment of the City of Chester." Plaintiff's Brief in Opposition (Document No. 6) at 13. Hoopes thus appeals to judicial notions of "the public interest," and in so doing, he underscores the inadequacy of the *Pickering* doctrine for resolving this dispute between Hoopes and Nacrelli. *Pickering*, as I noted earlier, calls for a balancing of "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the pubic services it performs through its employees." *Pickering v. Board of Educ., supra*, 391 U.S. at 568, 88 S.Ct. at 1734–35. If no other interests are taken into consideration, then Hoopes' conduct, if it in fact disrupted his working relationship with Mayor Nacrelli, is simply not protected by the first amendment. But Hoopes' activities *do* implicate another interest that was not present in *Pickering*, *Sprague*, or *Roseman*. I refer to the federal interest in encouraging persons who know of possible violations of federal criminal law to come forward and relate such information to federal prosecutors, to the grand jury, and (if an indictment is returned) to the petit jury at trial. *See generally* 18 U.S.C. § 1503 (1976). When necessary, of course, compulsory process may be had to insure that such information is disclosed. But the federal interest in enforcement of the federal criminal laws extends further. A potential witness who fears retaliation if he testifies truthfully may evade process, or, if he cannot escape testifying, he may perjure him-

self. If a federal criminal defendant may, with impunity, visit sanctions upon a prosecution witness who gives truthful testimony, then the federal interest in vigorous and effective law enforcement may well be frustrated, for other potential witnesses, fearing similar retribution, may endeavor to avoid testifying truthfully or to avoid testifying at all.

 Hoopes apparently would have me resolve this case within the general *Pickering* framework, by placing the additional "public interest" that is present here alongside his individual free speech interest and then balancing their combined weight against the City of Chester's interest in providing effective, uninterrupted police services to its citizens. I certainly could not undertake to balance these interests based solely on the complaint. And once a factual record has been compiled, this approach would still present problems. First of all, I question how one would "weigh" three such diverse interests. Special problems might arise in balancing a federal interest against a conflicting state or local interest. U.S. Const. art. VI. Moreover, even if a general balancing test is the proper standard, *Pickering* and its progeny are no longer directly controlling, for once the federal interest that I have described is added to the picture, this case is no longer predominantly a free speech case. In any event, I need not decide at this juncture precisely what legal standard would best accommodate the conflicting interests involved here. Plaintiff has pleaded this case as a free speech case, and all that I need resolve at this time is the legal sufficiency of his free speech claim.[4]

4. I note in passing that Hoopes would seem to have a substantial state-law damages claim for wrongful demotion. Hoopes concedes that he was an at-will employee, in the sense that Nacrelli was free to demote him without cause. Generally, an at-will employee who is discharged has no common-law cause of action against his employer, *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174 (1974), and the same result should obtain for an at-will employee who is merely demoted. Yet the Supreme Court of Pennsylvania, in *Geary*, left

open the possibility that an at-will employee who is discharged on grounds that violate public policy might have a cause of action for wrongful discharge "if the mandates of public policy were clear and compelling." *Bonham v. Dresser Indus., Inc.*, 569 F.2d 187, 195 (3d Cir. 1977), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978). And the Superior Court of Pennsylvania recently held that Pennsylvania law "recognizes a cause of action for damages resulting when an employee is discharged for having performed his obligation of jury ser-

# 1224

Defendants advance three additional arguments with respect to Hoopes' section 1983 claim. Each of these challenges the sufficiency of the complaint only as it pertains to particular defendants. The first of these arguments is plainly without merit; the other two, which are closely related, are more substantial.

■ First, defendants seek dismissal of the complaint insofar as it relates to defendants Nacrelli, Johnson, Macneilly, Osowski, and Sharp—the Mayor and the members of the City Council—in their *individual capacities*. Section 1983 imposes liability for a deprivation of constitutional rights only if that deprivation is accomplished "under color of law," *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and the five defendants just named argue that public officials sued in their individual capacities cannot be said to have acted "under color of law." I recently had occasion to consider this precise issue in *Kedra v. City of Philadelphia*, 454 F.Supp. 652 (E.D.Pa.1978). I noted there that public officials are frequently sued in both their individual and their official capacities, for reasons that have never been closely analyzed, but that these alternative forms of pleading have little bearing on substantive issues of liability under section 1983:

> "Whatever the ramifications of the official/unofficial capacity distinction, it is not controlling for purposes of the statutory requirement that a § 1983 defendant act 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.' That requirement is addressed to the source of authority for the defendant's conduct, and, so long as the state has clothed the defendant with apparent authority to act, the requirement has been met."

454 F.Supp. at 664.

*See also Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, at 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611. That requirement is easily met in this case, for the complaint alleges that Nacrelli acted "under color of the authority conferred upon him by the laws of the Commonwealth of Pennsylvania," and that the four members of the City Council acted "under color of the authority conferred upon them in the Third Class City Code." Complaint ¶ 26. Thus, Hoopes has stated a claim under section 1983 against these five defendants, each of whom is sued in both his individual and his official capacity. *See generally Kedra v. City of Philadelphia, supra*, 454 F.Supp. at 664–66.

■ Defendants also contend that the complaint fails to state a claim against the members of the City Council, because they lacked authority to prevent Nacrelli from demoting plaintiff, to restore plaintiff to his position as Chief of Police, or to designate his successor in that position. Yet Hoopes plainly alleges that on March 21, 1979, the members of the City Council, as part of a conspiracy with Nacrelli to retaliate against plaintiff, "made William Hamilton the permanent Chief of Police and failed to restore plaintiff to that position." Complaint ¶ 23. This allegation is certainly puzzling, for the Third Class City Code appears to lodge with the Mayor the exclusive authority to designate the Chief of Police. Pa.Stat.Ann., tit. 53, § 37002 (Purdon Supp.1979). The members of the City Council, however, have not clarified their role in these events by affidavit or otherwise, and I am bound to treat plaintiff's allegation as true for purposes of this motion. In essence, the City Council members argue that as a matter of state law, they had no authority to do what plaintiff alleges they did. But a state or local official who exceeds his lawful authority may still be acting "under color of law" for

vice." *Reuther v. Fowler & Williams, Inc.*, 255 Pa.Super. 28, 32, 386 A.2d 119, 120 (1978). Given that retaliation against an employee who leaves work to serve on a jury violates public policy, it appears that retaliation against an employee who gives truthful testimony in a federal criminal prosecution of a high city offi-

cial also violates public policy. And if demotion is a lesser form of retaliation than discharge, that distinction would seem to go only to the measure of damages, and not to the recognition of the employee's cause of action. In any event, Hoopes has not pleaded such a cause of action here.

purposes of section 1983. Indeed, "[w]hether he is acting within the lawful scope of his authority is of little legal significance so long as his apparent authority flows from the state or his conduct is in some way related to the state." *Kedra v. City of Philadelphia, supra*, 454 F.Supp. at 665. Consequently, I cannot dismiss the complaint against the City Council members simply because it charges them with conduct that was beyond their authority as a matter of state law.

■ Finally, defendants challenge the complaint insofar as it pertains to the City of Chester and the City Council itself. They note that *Monell v. New York City Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), delimits the liability of municipalities and other local government units under section 1983, and they urge that plaintiff's allegations are insufficient under *Monell* to impose any liability upon either the City or the City Council. The complaint, according to these defendants, seeks to hold them liable for wrongs allegedly committed by the Mayor, an employee of the City, and this sort of *respondeat superior* liability is expressly barred by *Monell. See* 436 U.S. at 690–95, 98 S.Ct. 2018.

Plaintiff acknowledges that *respondeat superior* is unavailable to him against either the City or the City Council. He relies on the following remark found in the *Monell* opinion: "[L]ocal governments, like every other § 1983 'person,' * * * may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the [governmental] body's official decisionmaking channels." 436 U.S. at 690–91, 98 S.Ct. at 2036. *See generally Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 162–69, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (discussing "custom" as used in § 1983). The question here, then, is whether Hoopes has sufficiently alleged a "custom" to enable him to seek relief from the City and the City Council.

The relevant allegations of the complaint are as follows:

"28. Defendant Nacrelli's actions in demoting plaintiff from Chief of Police to Inspector was [*sic*] one of many occasions wherein Defendant Nacrelli exercised arbitrary control over the Police Department of the City of Chester, controlling the said Department according to his personal pleasure, without regard to the rights of others and his obligations under the law as Mayor of the City of Chester.

29. Defendants' activity as aforesaid was representative of an execution of a policy statement, regulation or decision officially adopted and promulgated by the Mayor and by the [City] Council of the City of Chester, with the said conspiracy as aforesaid further evidenced when both the Mayor and Council failed to restore plaintiff to his position of Chief of Police.

30. The defendants' activity as aforesaid was reflective of a custom in the City of Chester during the course of the Defendant Nacrelli's term as Mayor, and even prior thereto, whereby the Mayor of Chester controlled the Police Department for his own personal gain and pleasure, rather than for the advancement and protection of the citizens of Chester. The Defendants Johnson, MacNeilly, Osowski, Sharp, each individually and as Councilmen of the City of Chester, and Defendant Nacrelli as President of the City Council of the City of Chester, conspired with each other, agreed and ratified the aforementioned custom by their activities as hereinbefore alleged.

31. The actions of Defendant Nacrelli as Mayor and President of City Council, and the actions of the Defendants Johnson, MacNeilly, Osowski, and Sharp, each individually and as Councilmen of the City of Chester, were representative of the execution of an official policy or custom of the City of Chester, of the Office of Mayor, and of the City Council, and thereby was the action [*sic*] of the De-

fendant City of Chester, a Municipal Organization."

Thus, Hoopes contends that he was demoted pursuant to a custom in the City of Chester "whereby the Mayor of Chester controlled the Police Department for his own personal gain and pleasure." Complaint ¶ 30. Even if Nacrelli's practice of controlling the Police Department in this fashion was "so permanent and well settled" that it amounted to a "custom," *Adickes v. S. H. Kress & Co., supra*, 398 U.S. at 168, 90 S.Ct. 1598, I do not believe that it is a "custom" for which the City of Chester or the City Council may be held liable. As the Court stated in *Monell*, "it is when execution of a *government's* policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2038 (emphasis supplied). I suppose that the practices of a mayor might, in some circumstances, amount to a municipal "custom." But this is plainly not such a case. The "custom" that Hoopes alleges is stated in very general terms. It seems to encompass at least some of Nacrelli's predecessors in office, for plaintiff alleges that this "custom" began "prior" to the time Nacrelli took office. Complaint ¶ 30. But the content of this "custom" is defined by whatever the Mayor of Chester deems to be "his own personal gain and pleasure." *Id.* It is a mayoral custom, rather than a municipal custom, and *Monell* commands us to preserve distinctions such as this. If the City of Chester could be held responsible for any action taken by the Mayor in furthering his own personal gain and pleasure (so long as it involved the Police Department), then the doctrine of *respondeat superior* would seem to have been resurrected. In my view, *Monell* does not sanction this approach. Accordingly, I shall dismiss Hoopes' section 1983 claim against the City of Chester and the City Council for failure to state a claim.

In conclusion, then Hoopes' section 1985(c) claim will be dismissed in its entirety, while his section 1983 claim will be dismissed only with respect to the City of Chester and the City Council. I shall also dismiss Hoopes' pendent libel claim, for the reasons stated in note 1, *supra*. In all other respects, defendants' motion to dismiss is denied without prejudice to their right to seek summary judgment based on an adequate factual record.