C. James TROTMAN, Mary Farrell, Andrew Murray, Virginia Gunn, Thomas Jones, Julius Bellone, Deforest Rudd, Peter F. Hoffer, Donald Pierce, Richard Winchester, William T. Johnson, Edward B. Groff, and Leland Smucker, Appellants,

v.

BOARD OF TRUSTEES OF LINCOLN UNIVERSITY of the Commonwealth System of Higher Education, Lincoln University of the Commonwealth System of Higher Education, and Herman Branson, individually and as President of Lincoln University.

No. 79–2490.

United States Court of Appeals, Third Circuit.

Argued June 10, 1980.

Decided Nov. 25, 1980.

David Kairys (argued), Kairys, Rudovsky & Maguigan, John A. Beck, Bronstein & Beck, Philadelphia, Pa., for appellants.

J. Freedley Hunsicker, Jr. (argued), Francis J. Connell III, Cynthia J. Giles, Drinker Biddle & Reath, Philadelphia, Pa., for appellees.

Before GIBBONS, WEIS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

It is unfortunate that resort to the courts has been deemed necessary in a case of this kind. Almost all litigation between individuals has an emotional aspect for the parties. But when the controversy arises out of deep divisions in the academic community, as does this one, the judicial process seems particularly inapt. The academic process entails, at its core, open communication leading to reasoned decisions. Our society assumes, in almost all cases with good rea-

son, that different views within the academic community will be tested in an atmosphere of free debate. It is the dialectic process which underlies learning and progress. In contrast this dispute, which pits the president and administration of a state–related Pennsylvania institution against at least a quarter of the faculty, has been attended by dismissal of a dissenting faculty member, disruption of classes, arrest of faculty members, attempted stifling of debate and other sorry incidents. The setting for this dispute is Lincoln University, which is described in one of the exhibits in the record as "the country's oldest college in continuous existence for the higher education of black students." However this dispute is ultimately resolved, the residue of bitterness will not soon be dispelled, and must inevitably impede the primary goal of an institution of higher learning. Although our judicial responsibility requires that we take jurisdiction of the issues and decide the case, we are cognizant, and we hope the parties are, that some other process of resolution would have been far preferable.

## I.

The amended complaint was filed by fourteen present and former faculty members of Lincoln University[1] against Herman Branson, President of the University, the Board of Trustees,[2] and Lincoln University itself, a state–related institution in Chester County, Pennsylvania. Plaintiffs allege that in order to suppress faculty criticism of University policy, defendants discharged, failed to promote, and otherwise punished plaintiffs, and took action which directly infringed upon their right to freedom of speech. Plaintiffs also allege a number of other constitutional violations, including infringement of their right of association, assembly, due process, and equal protection of the law, but essentially plain-

tiffs recognize that their case must rise or fall with the free speech issue. Plaintiffs' amended complaint also alleges claims under the Pennsylvania Constitution, plaintiffs' employment contracts, and the collective bargaining agreement between Lincoln University and the Lincoln University Chapter of the American Association of University Professors (LUC–AAUP), none of which were specifically discussed by the district court. The complaint sought compensatory and punitive damages as well as injunctive and declarative relief.

The case was tried before the district court without a jury, and at the conclusion of plaintiffs' case, the court granted defendants' motion to dismiss. The court concluded:

[I]n my view of the evidence, there was a reasonable basis for every action complained of here, which was totally unrelated to the exercise by the plaintiffs of their constitutionally protected rights.

\* \* \* \* \* \*

In sum, I feel that there was no attempt by the President of the University, the Board of Trustees or any members thereof, or anyone associated with the Administration of the University to suppress, stifle, chill or in any way inhibit the constitutionally protected activities of the faculty members.

On appeal, plaintiffs claim that the district court failed to apply the correct legal standards in determining whether plaintiffs' protected speech was suppressed or restricted by the defendants; that the court erroneously refused to permit plaintiffs to testify about the chilling effects of defendants' actions; that the court refused to give sufficient weight to two arbitration findings favorable to plaintiff Trotman on the issue of his dismissal; that several of the court's factual findings were clearly errone-

---

1. The original complaint was filed by seventeen faculty members. According to plaintiffs, three withdrew because they were no longer connected with the University. One of the fourteen remaining plaintiffs withdrew during trial for personal reasons unrelated to this dispute.

2. The district court held that the Board of Trustees is not an entity that can be sued as such. That holding is not on appeal.

ous; and that the district court erred in denying plaintiffs a jury trial which plaintiffs first sought in their amended complaint.

For the reasons stated below we will reverse the judgment of the district court and remand the case for a new trial.

## II.

The genesis of the controversy was President Branson's efforts to increase the student–faculty ratio from 12 to 1 to 20 to 1, which would have comported with guidelines promulgated by the Pennsylvania Department of Education, independent recommendations, and the practice at other Pennsylvania state–related institutions which had higher ratios than did Lincoln. This would have necessitated significant reductions in the size of the Lincoln faculty, and that faculty accordingly failed to agree to a Plan of Retrenchment proposed by Branson. On April 26, 1977, the faculty, on motion of W. T. Johnson, Chairman of the Chemistry Department, voted 46 to 10 at a faculty meeting to censure Branson and to ask the Governor to replace him. On April 28, 1977, Branson implemented his decision to send notices of termination to every faculty member, regardless of tenure, seniority, or likelihood of actually being terminated. These notices were sent pursuant to a faculty bylaw requiring that each faculty member be given one year's notice before termination. By December 1977 all of the retrenchment notices were rescinded with the exception of the one to plaintiff Trotman, an outspoken critic of the administration.

The retrenchment notices led to widespread, heated faculty opposition. Such opposition took many forms, including speeches, meetings, letters to the editor, faculty resolutions and picketing. The response of the University, and particularly Branson, is the basis for the plaintiffs' claim that defendants' actions violated plaintiffs' constitutional rights. For purpose of analysis, such actions will be grouped into those involving alleged retaliatory actions and those involving more direct infringement on speech.

## III.

### A.

### Retaliatory Action

#### 1. *Dismissal of Trotman*

C. James Trotman was Chairman of the English Department in April 1977 when these events began. He began teaching at Lincoln in the 1967–68 academic year; his teaching contract was renewed the following year. In 1969 Trotman took an extended leave in order to take graduate courses at Columbia University Teachers College, obtaining a Doctor of Education Degree (Ed.D.) in English. He returned to Lincoln in 1973 and was named Chairman of the English Department in that year. If his contract had been renewed during the 1977–78 academic year, he would have been awarded tenure because of his length of service. He was, however, an outspoken critic of President Branson and the retrenchment program. He was removed as Chairman of the English Department on June 30, 1977, and by letter dated December 13, 1977 he was notified that he was terminated as of June 30, 1978.

Although the action was dismissed before defendants presented their case, their defense emerges through cross–examination and argument. Defendants claim, and the trial court found, that Trotman was fired because the University had no evidence that Trotman had acquired an earned doctorate in the field of English, and that any criticism of President Branson in which Trotman engaged was not a factor in Branson's decision to deny him tenure. Trotman claims he did not realize Branson thought the degree was in English as opposed to Education with a concentration in English, that the degrees are identical for teaching purposes, and that the degree question is a sham. Trotman filed a termination grievance for binding arbitration as required by the collective bargaining agreement between the faculty and the University, which ultimately concluded with an award in his favor requiring the University to treat the

1978–79 academic year as though Trotman had, in fact, taught full–time in the English Department for all purposes including "the purpose of achieving de facto tenure."[3] This award is currently on appeal.

### 2. "Retirement" of Edward Groff

In November 1977, Edward Groff, a Professor of English, learned that he would have to undergo brain surgery. Groff was another active critic of the Branson administration. He sought to be placed on sick leave and was assured by University Vice President Wade that that presented no problem. Upon returning home on January 13, 1978, Groff found a letter from Branson, dated January 5, informing him that he was retired effective December 31, 1977. The difference between retirement and sick leave was significant, retirement resulting in lower income and loss of medical benefits and coverage. Although Wade told the Union contract administrator on January 12 and 13 that he understood that Groff did not want to retire and that a mistake had been made, Branson attempted to justify the administration's actions in a January 18, 1978 memorandum to faculty and trustees. It was only after protest by faculty members in the next several weeks over Groff's "retirement" that Branson denominated the University action a misunderstanding and reinstated Groff.

The district court found that the "retirement" was not in retaliation for Groff's outspoken criticism of the administration, as plaintiffs alleged.

### 3. Removal of Johnson from Chemistry Chair

Plaintiff Johnson, originally appointed by Branson as Chairman of the Chemistry De-partment, was removed from that position by Branson in 1978, at the end of a tumultuous year in which Johnson was "in the forefront of the faculty dissidents and was quite outspoken in his criticism of President Branson." His removal prompted a petition signed by 25 faculty members who termed the action by Branson "a retributive action."

In this instance, unlike in the other two, the district court did not find a lack of connection between Johnson's criticisms and his removal as Chairman. Rather, the court held that Johnson's conduct undermined the "harmony and mutual respect which should exist between the head of the University and the Chairman of one of its academic departments," adding "the grossly offensive comments of W. T. Johnson cannot march under the banner of the First Amendment or of academic freedom."

### 4. Arrests of Trotman and Farrell

On September 1, 1977, Trotman and Alfred Farrell, another member of the English Department, were standing with other individuals in a classroom to protest the action of Gladys Willis, who had been appointed by Branson to chair the English Department, in assigning herself to teach a course formerly taught by Farrell. Thereafter both Trotman and Farrell were arrested by campus police, and Trotman was charged with disorderly conduct. Ultimately, the Board of Trustees decided not to press charges.

The district court found that Trotman and others demonstrated in Willis' classroom and created disruptions which pre-

**3.** An initial arbitration award found that the notice of termination sent to Trotman as part of the general retrenchment notice to all faculty members did not constitute adequate notice that Trotman would be dismissed because of his alleged lack of the necessary qualifications. The arbitrator further found that dismissal of Trotman pursuant to a valid retrenchment notice required the University to comply with the provision of its collective bargaining agreement that it make "every reasonable effort ... to place [Trotman] in another suitable position."

In a subsequent arbitration proceeding, a second arbitrator determined that the University had not complied with the initial award since it failed to offer Trotman a position in the English Department although two part–time instructors were hired to teach his courses. Trotman was awarded back pay for the 1978–79 year and all other benefits which would have accrued to him had he been a member of the Lincoln faculty during that year.

vented her from teaching class, and that Trotman's arrest did not violate his constitutional rights.

## B.

### Restrictions on Speech

#### 1. *Bellone letter*

The faculty sought to censure Willis for reasons related to the assignment dispute. Branson refused to allow the faculty to vote on the censure motion at a faculty meeting of September 13, 1977. Plaintiff Bellone, as spokesman for the English faculty, made a censure motion at the October 1977 faculty meeting which Branson ruled out of order. Defendants contend that Branson's rulings were based on his belief that faculty by-laws required personal charges to be brought before the University's judiciary committee and not before an open faculty meeting.

On October 13, 1977 Branson sent Bellone a registered letter, which in pertinent part read:

> [Y]ou have moved that the faculty vote to censure your colleague and department chairman, Dr. Gladys Willis....
>
> \* \* \* \* \* \*
>
> We regard your continuing attempts to have this resolution voted on by the faculty most seriously.
>
> Please treat this as a warning that any further breaches of commonly–accepted academic principles of fair play will be considered cause for appropriate discipline, including termination of your employment contract at Lincoln.
>
> I am placing a copy of this letter together with your motion of September 13 in your personnel file.

Plaintiffs claim that Bellone was deterred from making the motion again, although no disciplinary action was taken against him. Subsequently, the faculty held a "divisional" meeting, in which the faculty met without President Branson in the chair. At this meeting, on November 15, 1977, the motion passed. The district court found Bellone "has suffered no harm from Dr. Branson's letter warning him that he considered the continuation of attempts to censure Dr. Willis at faculty meetings to be grounds for discipline. Under the University's By–Laws, a hearing before the judiciary committee, composed of fellow faculty members, is required before a tenured faculty member such as Bellone can be terminated, and a fair hearing is required before any lesser discipline can be imposed."

#### 2. *Disciplinary Meeting on Communication*

At a faculty meeting on May 2, 1978, plaintiff Virginia Gunn criticized her department chairman, Joseph Rodgers, of the Languages and Linguistics Department. Later that same day Rodgers wrote a memo to the administration evaluating Gunn and criticizing her teaching abilities. Among the items mentioned by Rodgers was a reference to the "inordinate amount of time [Gunn spent] writing memos and seeking bones of contention." Eight of the plaintiffs wrote to Rodgers on May 16, 1978 accusing him of making "an unwarranted and personal attack" upon Gunn, whom they termed an excellent teacher. That letter was distributed to the faculty together with a copy of the Rodgers' evaluation of Gunn, which had been attached with Gunn's approval. Subsequently, Branson sent a letter to seven of the signers objecting, in strong terms, to their letter and distribution and requesting their attendance at a "meeting" with him and University counsel. The faculty members had not been advised in the letter that the University contemplated that this was a hearing from which discipline might result. When they learned that at the "hearing", they refused to participate further. No disciplinary action was ever taken as a result of the meeting.

Plaintiffs claim that defendants' conduct in this connection had a chilling effect on them and caused some of them emotional stress. The district court found that "[i]t is traditional that communications regarding evaluations of teachers be kept confidential." Plaintiffs contend this finding is clearly erroneous, relying on "unrebutted testimony" that each faculty member may

decide whether a confidential memo placed in his/her file ought to be released.

### 3. Branson Letters Regarding Press Communications

On October 6, 1975 Branson wrote to the LUC–AAUP bargaining committee criticizing three of the plaintiffs for allegedly inaccurate statements which had appeared in the West Chester Daily Local News several days earlier. Branson's letter read in part:

> [Plaintiffs] Mr. Jones, Mr. Pierce and whoever else are responsible for that October 3, 1975 article are guilty of violating these three principles: the article is viciously inaccurate; the article shows no restraint; and the article is not balanced or fair or just. Inasmuch as the violated principles are those of AAUP, the *University expects some action.* No school can permit itself to be so irresponsibly maligned. (emphasis added)

In a second incident, the Philadelphia Bulletin published a story on May 26, 1976, quoting two of the plaintiffs on the effect of a proposed administration plan to cut faculty by one–third. On June 7, 1976, Branson wrote plaintiff Winchester the following letter, with copies to the University's attorneys and the Chairman of the Board of Trustees:

> In the Philadelphia Evening Bulletin on Wednesday, May 26, 1976, you are quoted verbatim in a news story. A copy of the story is enclosed. Please check the statement attributed to you carefully. If this office does not receive a corrected statement from you by June 17, 1976, I shall interpret your failure to correct the statement as admission that what you are quoted as saying you did say.

Finally, on November 15, 1977 Branson wrote a letter to the University attorney which was placed in Plaintiff Pierce's personnel file. It stated in part:

> Again the Union has engaged in completely unethical behavior. Pierce called the Daily Local News Reporter and read the AAUP letter to him! This deserves a strong letter from you to AAUP Washington.

Plaintiffs assert they viewed the above letters as threats of punishment for speaking to the press and that on some occasions they were deterred from such protected activity.

The court held that the October 6, 1975 letter was not a threat and did not prevent plaintiffs from maintaining contacts with the press. The other two letters were not specifically addressed by the trial court.

### 4. Telegram Regarding Faculty Picketing

In late April 1978, faculty members, including most of the plaintiffs, announced their intention to conduct a picket or vigil during former President Ford's visit to the campus, the protest aimed at drawing attention to perceived problems at Lincoln. Plaintiffs had previously picketed the offices of the law firm representing the University on two occasions, and they had also picketed the office of the acting Board Chairman in Oxford, Pennsylvania.

On the night of April 25, 1978, preceding President Ford's visit of April 26, a number of the plaintiffs received this phone–delivered telegram at their homes:

> Lincoln University considers any faculty picketing during term of collective bargaining [sic] to be in violation [sic] and unprofessional conduct, a cause for discipline up to dismissal.
>
> J. Freedley Hunsicker, Jr.
> Attorney for the University
> Lincoln University
> Lincoln University, PA 19352

Hunsicker testified at trial that the telegram was authorized and sent by Branson except for two grammatical errors not affecting the telegram's substance. Some plaintiffs picketed the next day but no disciplinary action was taken.

Plaintiffs contend the telegram bans all faculty picketing without regard to time, place, manner, or subject matter. Plaintiffs assert the telegram affected the content and nature of the ensuing picketing. Defendants claim the telegram was sent on Branson's belief that the picketing would involve issues exclusively controlled by the grievance resolution provisions of the collec-

tive bargaining agreement in effect at that time. They state that when the University counsel determined that such issues were not involved, no disciplinary action was taken.

The district court found:

The University's objection to picketing by members of the faculty was based upon a good faith belief that picketing over matters subject to the contractual grievance procedures was unlawful. As for those to whom the telegram of April 25, 1978 was sent, they were not at all deterred from exercising their rights. They appeared on the scene carrying signs protesting the issuance of the telegrams.

## C.

Other Alleged Unconstitutional Conduct

The actions referred to in the prior two sections do not represent an exhaustive summary of all of the allegations plaintiffs have made as to unconstitutional conduct by the defendants, but they are representative of plaintiffs' claims. Additionally, plaintiffs allege that the Board of Trustees publicized a resolution condoning the arrest of Trotman without giving him an opportunity to be heard on the issue; the University has refused to promote plaintiffs Pierce, Bellone and Winchester because of their opposition to University policies and their active participation in the faculty union; the University reduced plaintiff Mary Farrell's status to that of part–time instructor instead of instructor, thereby removing her from the tenure track; Branson withheld plaintiffs' contracts for five weeks in retaliation for their picketing; John Ware, Acting Chairman of the Trustees, informed plaintiffs at an April 1978 Board meeting that they would be subject to dismissal if they spoke out; and Branson failed to offer the Chemistry chair to plaintiff Smucker, who was next in line, after Branson had wrongfully removed Johnson from the position. It is unnecessary for us to consider in any detail each of the numerous allegations in view of our disposition of this case.

## IV.

### A.

Most cases that have raised the free speech rights of faculty members in state–related institutions have arisen in the context of a claim that adverse administrative action was taken as a result of the faculty member's criticism of the administration or unwillingness to follow certain standards of mandated conduct, such as the salute to the flag. Suits seeking reinstatement have been commonly brought by professors denied tenure or teachers who have been dismissed allegedly as a result of their exercise of their First Amendment rights. The focus in such cases has been directed to development of the standards for ascertaining the required nexus between the administrative action and the exercise by the faculty member of First Amendment rights.

■ Examination of a teacher's claim of retaliation based on engagement in protected activity requires a three step process. First, the plaintiff must show that s/he engaged in protected activity. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). In that case the Court stated that "the interests of the [employee] as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," *id.* at 568, 88 S.Ct. at 1734–1735, and held that comment on matters of legitimate public concern by public school teachers is ordinarily protected activity. Second, a claimant who demonstrates that the activity was protected must then show that the activity was a substantial or motivating factor in a decision or action taken against the claimant. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Third, the defendant can still defeat plaintiff's claim by demonstrating that the same action would have been taken even in the absence of the protected conduct. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410,

416–17, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576. Put in another way, the employee can prevail only if the court finds that but for the protected activity, the employee would not have been removed. Note, *Free Speech and Impermissible Motive in the Dismissal of Public Employees,* 89 Yale L.J. 376, 377, 383–84 (1979).

The district court viewed this case as presenting essentially the issue of the claimed retaliation and referred to the aforesaid model in its discussion. Had plaintiffs only requested relief from adverse employment decisions, and had the court followed the appropriate paradigm without legal error, then plaintiffs would have the heavy burden of proving that the district court's adverse findings on the relevant factual issues as to the reasons for the administrative actions complained of were "clearly erroneous." As noted in Part III, the district court found that most of the administrative actions were taken for reasons unrelated to the criticisms of administrative action expressed by particular faculty member.

■ However, we do not view this case as primarily one by faculty members seeking reinstatement. Many of the plaintiffs are faculty members who are already tenured, who remain on the Lincoln faculty, and who do not seek action of the court to remedy a personnel decision. Even Trotman may be reinstated through the arbitrators' awards, if affirmed, without the need for any action by the federal courts. Therefore, this action may be viewed as one in which plaintiffs seek judicial censure of a course of conduct which they consider as having violated their constitutional right to engage in spirited criticism of administrative policies with which they disagree. Even if there were no claims seeking reinstatement or damages, plaintiffs' claims would be viable since suits for declaratory or injunctive relief have long been acknowledged to be effective means to protect free speech rights and redress their violation. Although the district court did conclude that plaintiffs' rights were not abridged, it is not apparent from the district court's opinion that the court separately considered plaintiffs' claims for declaratory and injunctive relief. To evaluate these claims, it is necessary first to analyze whether plaintiffs were engaging in protected activity and whether they have shown that defendants' actions infringed upon their rights.

### B.

■ That much of the activity engaged in by plaintiffs falls within the protection of the First Amendment seems too evident to require any discussion except that acknowledgment of that fact was not expressly made by the district court. The activity involved was essentially criticism of Branson and his policies and methods, which is "core" speech squarely encompassed within the First Amendment. It is not deprived of the protection of the First Amendment merely because it was strident.[4] The district court apparently focused on the content, i.e. merit or "legitimacy", of some of the speech involved. Thus it found that "Johnson's involvement *went beyond the pale of legitimate discussion* when, in a telegram to the Governor of Pennsylvania seeking Branson's removal as President of the University, he accused Branson of 'terribly irrational and destructive' conduct and characterized him as 'inhumane', 'vicious', 'vindictive' and 'arrogant with power given him by a weak Board.'" (emphasis added). Speech with far less claim to legitimacy than a telegram by a faculty member at a state–related institution to his Governor has been held to fall within the scope of the

---

4. As used in the text, the phrase "protection of the First Amendment" refers to embodiment of the language or activity within the term "speech", as distinguished from obscenity, which is accorded no refuge. *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). To some extent, of course, the "protection" afforded by the First Amendment even to expressions falling within its scope can be diminished since, as noted at pp. 229–230 *infra,* consequences such as dismissal may flow under certain circumstances from the expression by public employees of what would ordinarily be fully protected speech.

First Amendment, *see, e.g., Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), and any suggestion by the district court to the contrary was therefore erroneous. The possibility or even the likelihood that plaintiffs may have been misguided or obstinate, as a state investigative commission found, does not derogate from the status of their expressions as speech within the First Amendment.[5]

■ Plaintiffs' picketing activity, while not pure speech like their petitions, letters, and comments to the press, "plainly involves expressive conduct within the protection of the First Amendment . . . ." *Police Department of Chicago v. Mosely*, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). Although picketing and parading are subject to reasonable time, place and manner restrictions, they cannot be restrained on the basis of their content. *Grayned v. City of Rockford*, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972). *See Cox v. New Hampshire*, 312 U.S. 569, 575–76, 61 S.Ct. 762, 765, 85 L.Ed. 1049 (1941). However, there was one aspect of plaintiffs' activity which was entitled to no protection, and the district court correctly found that the disruption by Trotman and Farrell of Willis' English class is not constitutionally protected conduct. For that reason, it cannot serve as the predicate for any claim of constitutional deprivation. With that exception, the analysis of plaintiffs' claims must proceed to the second step, which involves a determination of whether defendants infringed upon plaintiffs' free speech rights.

In support of their claim of such infringement, plaintiffs point to Hunsicker's telegram authorized by Branson stating that Lincoln would consider faculty picketing "a cause for discipline up to dismissal"; actions by Branson which they characterize as threats of disciplinary action against faculty critics based on their speaking to the news media, such as the letter stating "No school can permit itself to be so irresponsibly maligned", and the scheduling of a disciplinary hearing following communications to the press by some plaintiffs; and the letter to Bellone warning that his continuing attempts to have the Willis censure resolution voted on "will be considered cause for appropriate discipline, including termination of your contract at Lincoln."

■ The district court treated these claimed infringements in two ways. With respect to the telegram which clearly was designed to inhibit the plaintiffs from exercising their First Amendment right to picket, the court found that the telegram was sent because of the University's good faith belief that the picketing would be over matters subject to the exclusive grievance procedures of the collective bargaining agreement. The court also found that the telegram on picketing, the letters regarding faculty members' contacts with the press, and other letters from Branson did not intimidate or restrain plaintiffs because they proceeded to picket nonetheless and because they continued to go to the press with their complaints. The court appears to have fashioned or accepted two defenses to free speech restraints, one based on the defendants' good faith and the other based on the plaintiffs' persistence. Neither defense has

---

**5.** In *Cohen v. California*, 403 U.S. 15, 24–25, 91 S.Ct. 1780, 1787–1788, 29 L.Ed.2d 284 (1970), the Court commented as follows:

To many, the immediate consequences of this freedom may often appear to be only verbal tumult, discord, and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in this sense not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise

might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated. That is why "[w]holly neutral futilities . . . come under the protection of free speech as fully as do Keats' poems or Donne's sermons," *Winters v. New York*, 333 U.S. 507, 528 [68 S.Ct. 665, 676, 92 L.Ed. 840] (1948) (Frankfurter, J., dissenting), and why "so long as the means are peaceful, the communication need not meet standards of acceptability," *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 [91 S.Ct. 1575, 1578, 29 L.Ed.2d 1] (1971).

any support in the legal precedent nor any logic or policy to commend it.

■ Good faith has never been accepted as a justification for a constitutional violation, and there is even less reason to accept it when the violation alleged is restraint of free speech, one of the most fundamental of all constitutional rights. At most, good faith of the defendants would be relevant on the issue of damages, an issue the district court never reached. Individual defendants may have a good–faith immunity defense to personal liability in damage actions, *see, e.g., Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), but the conduct which gave rise to the cause of action is not therefore legitimized or exculpated. As the Supreme Court recognized in *Owens v. City of Independence*, 100 S.Ct. 1398, 1416 (1980), qualified immunity is sometimes granted because of "overriding considerations of public policy" but this does not affect the question of the legality of the underlying governmental conduct, or its amenability to injunctive relief.

The other defense accepted by the district court here, that because plaintiffs persisted in their First Amendment activities they cannot complain of any constitutional violation, is similarly unacceptable. Such a defense would limit the protection of the First Amendment to those who are timid but eliminate it for those who are brave. It would indeed be ironic were we to hold that persons who are persevering and resolute, who overcome their inhibitions and fears to proceed on a course they believe constitutionally protected, would thereby lose the very protection which they rely on in asserting their rights. It may be that as a result of their determination or stamina they cannot show damage, or that the passage of time may alter the circumstances to obviate the need for injunctive relief, but there is no basis for denying them, at the least, the requested remedy of declaratory judgment if they can show entitlement thereto.

■ In any event, in this case plaintiffs produced evidence that defendants' actions were far from ineffective. Bellone testified he was "reluctant to make constructive criticisms within the [English] department" and did not again raise his censure motion after receiving Branson's letter warning him not to; Pierce testified he became "hesitant about even talking to the press"; Rudd testified that he tried to stay out of disputes as much as he could. There was testimony about a "sense of inhibition of one's right to communicate with the press" and of unwillingness of professors to speak out about issues as they previously had done. The trial court never discussed this testimony.

Furthermore, the trial court repeatedly refused to allow plaintiffs and other faculty members to testify about their own chill and the inhibiting effect of defendants' actions.[6] In *Laird v. Tatum*, 408 U.S. 1, 11, 92

---

**6.** Objections were sustained, for example, to the following questions:

[To Plaintiff Bellone]: "[A]s a result of feeling threatened, have you not raised issues you otherwise would have?"

[To Professor Alfred Farrell, a non–plaintiff]: "Did these ... events affect your judgment after them when you were considering whether or not to speak out or criticize the administration?"

"Following these events were you afraid to criticize the administration?" Plaintiffs' counsel then asked the Court "[A]m I clear that I can't ask him about this fear of retaliation?" THE COURT: "*Yes. Just tell us the facts that happened.*" (emphasis added).

"[W]hy aren't you a plaintiff in the lawsuit?"

"Were you concerned about any possible retaliation if you did speak out?"

[To Plaintiff Murray]: "As a result of [defendants' actions] did you refrain from criticizing the administration?"

"Do you believe you have suffered any consequences from your speaking out?"

[To Plaintiff Winchester]: "Do you feel-now, and in the future, that you were in any danger if you speak out on the campus and criticize President Branson?"

"Are there activities that you will refrain from doing because of this fear?"

"Based on that fear, were there activities or conduct that you didn't engage in that you might have otherwise?"

[To Plaintiff Smucker]: "Are there activities or conduct on your part that you have not

S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972), the Court stated that "In recent years this Court has found in a number of cases that constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights. *E.g., Baird v. State Bar of Arizona*, 401 U.S. 1 [91 S.Ct. 702, 27 L.Ed.2d 639] (1971); *Keyishian v. Board of Regents*, 385 U.S. 589 [87 S.Ct. 675, 17 L.Ed.2d 629] (1967); *Lamont v. Postmaster General*, 381 U.S. 301 [85 S.Ct. 1493, 14 L.Ed.2d 398] (1965); *Baggett v. Bullitt*, 377 U.S. 360 [84 S.Ct. 1316, 12 L.Ed.2d 377] (1964)." [7] The Court has also noted that the "threat of sanctions may deter [the exercise of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). Reprimands for statements by an employee which may be "construed to convey the message that like comments in the future would put [the employee] in danger of discharge" have been held to be of "constitutional significance." *Yoggerst v. Stewart*, 623 F.2d 35, 39 (7th Cir. 1980).

The evidence introduced by plaintiffs and that which they were prevented from introducing supported or would have been relevant to their claim of specific present objective harm, and hence presents a far different claim than the "generalized allegations of chill" considered by this court in *Aiello v.*

*City of Wilmington*, 623 F.2d 845, 857 (3d Cir. 1980). Since evidence of chill would be relevant to plaintiffs' claim that defendants' activities did in fact result in an unconstitutional restraint on protected speech and conduct, the court erred in excluding plaintiffs' proffered evidence.

■ The district court viewed some of Dr. Branson's letters as "no more than the exercise by Branson of the same right which plaintiffs purport to defend." If those letters merely constituted a defense by Branson of his position on retrenchment or other matters of public concern, or his rebuttal to plaintiffs' criticism, then they would indeed be entitled to the same protection. However, the district court overlooked the fact that those letters contained language sometimes explicitly and other times implicitly threatening discipline up to dismissal if plaintiffs continued to engage in speech or other protected activity such as picketing. They therefore do not stand on the same level as letters written by adherents of opposing viewpoints on an internal dispute. They were written by a state official in a position of authority with the power to impose discipline. They are therefore state action which must be exercised in compliance with the mandate of the First Amendment and cannot be dismissed as merely part of an academic debate. A similar view was expressed in *Aebisher v. Ryan*, 622 F.2d 651 (2d Cir. 1980), a case brought

engaged in because you have been afraid of any retaliation?"

[To Plaintiff Pierce]: "Were there particular things that you did not do out of fear of retaliation?"

The trial court's policy toward this line of questions is reflected by the following colloquy between plaintiffs' counsel and the court:

Plaintiffs' Counsel: "I cannot ask him also what he did not do that he would have wanted to do out of fear of retaliation?"

The Court: "Yes ... substantively it is not admissible."

7. It is of some interest that the phrase "chilling effect" was first used in a case involving teachers' First Amendment rights. Justice Frankfurter wrote that:

By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no

matter what their calling. But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation. Such unwarranted inhibition upon the free spirit of teachers affects not only those who, like the appellants, are immediately before the Court. It has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers.
*Wieman v. Updegraff*, 344 U.S. 183, 195, 73 S.Ct. 215, 221, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring).

by two teachers who were reprimanded for commenting to the press about an incident of a student attacking a teacher. The Second Circuit reversed the action of the district court which had granted summary judgment on the grounds that the letters of reprimand were merely expressions of the employer's personal opinion or dissatisfaction. The court noted that "[w]here the use of coercive power is threatened, First Amendment rights may be violated by the chilling effect of governmental action that falls short of a direct prohibition against speech." *Id.* at 655.

■ On remand, in considering whether defendants' actions created the effect or chill prohibited by the First Amendment, the trier of fact should take into account the totality of the conduct alleged, including letters and telegrams containing threats of discipline as well as the administrative or personnel actions such as terminations, failure to promote and failure to grant tenure to faculty members who were outspoken and critical of the administration's viewpoint. An analysis of each discrete allegation without considering the impact of all of the facts and circumstances in combination would overlook the proverbial forest for the trees.

## C.

■ The claimed retaliatory actions appear in this case both as part of the evidence on which the allegations of First Amendment restraints are based and also as the predicate for separate claims for reinstatement, backpay and damages. In connection with these latter claims, plaintiffs contend that the trial court failed to follow the correct legal standards when it determined that plaintiffs were not the victims of unconstitutional retaliatory conduct. Before addressing the trial court's treatment of such claims, we must first note the significant difference in legal treatment which must be accorded plaintiffs' claim of unconstitutional restraint and plaintiffs' claims of retaliatory actions.

It can no longer be contended that public employees, even academics, have unlimited right to engage in speech and criticism without being subject to sanctions. As we noted above, although the Court has reiterated on numerous occasions that persons in public employment are not constitutionally compelled to relinquish the First Amendment rights they would otherwise enjoy to comment on matters of public interest, the Court has also cautioned that the public employee cannot engage in activity that impairs the efficiency of such public service. *See Pickering v. Board of Education*, 391 U.S. at 568, 88 S.Ct. at 1734. Obviously, defendants must be given their opportunity to show that plaintiffs' speech and actions in this dispute fell within the range of conduct which has been held to justify administrative sanctions. On the other hand, no case has held that any justification can be offered with respect to actions taken to suppress or prevent criticism.[8] It has always been recognized that there is a vast difference between state action which can be considered a form of prior censorship and action which holds the individual responsible once the speech or activity is concluded. *Near v. Minnesota*, 283 U.S. at 713–14, 51 S.Ct. at 630; *New York Times Co. v. United States*, 403 U.S. 713, 730, 91 S.Ct. 2140, 2149, 29 L.Ed.2d 822 (1971) (Stewart, J., concurring); *id.* at 733, 91 S.Ct. at 2151 (White, J., concurring).[9] As we noted in *Alderman v. Philadelphia Hous-*

8. In this case plaintiffs allege that defendants' restraints were directed to specific instances of criticism. We do not intimate that a University or other public employer cannot properly promulgate a general rule giving notice that employees who engage in conduct which causes disruption are subject to disciplinary action. Whether such action, when taken as a result of expressions within the scope of the First Amendment, improperly trenches on the constitutional rights of the employees requires an *ad hoc* decision.

9. We need not consider the possible justification based on national security since no such issue appears in this case. *See, e. g., United States v. Progressive, Inc.*, 467 F.Supp. 990 (W.D.Wis.), *appeal dismissed*, 610 F.2d 819 (7th Cir. 1979) (enjoining on national security grounds publication of article explaining how to construct a hydrogen weapon).

*ing Authority*, 496 F.2d 164, 170 (3d Cir. 1974), "the government must offer compelling proof that a prior restraint is essential to a vital government interest."

In contrast to the restraint situation, the courts have held that defendants can offer various justifications to support retaliatory action against an employee for his or her speech. Criticism of a superior which destroys the needed close working relationship has been held to justify dismissal of the subordinate. *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Sprague v. Fitzpatrick*, 546 F.2d 560 (3d Cir. 1976), *cert. denied*, 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977).

 It is particularly important that in cases dealing with academia, the standard applied in evaluating the employer's justification should be the one applicable to the rights of teachers and students "in light of the special characteristics of the school environment", see *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), and not that applicable to military personnel who must meet the "overriding demands of discipline and duty." *Parker v. Levy*, 417 U.S. 733, 744, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). *Cf. Gasparinetti v. Kerr*, 568 F.2d 311 (3d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978) (police officers). In an academic environment, suppression of speech or opinion cannot be justified by an "undifferentiated fear or apprehension of disturbance", *Tinker v. Des Moines Independent Community School District*, 393 U.S. at 508, 89 S.Ct. at 737, nor by "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509, 89 S.Ct. at 738. Instead, restraint on such protected activity can be sustained only upon a showing that such activity would " 'materially and substantially interfere with the requirement of appropriate discipline in the operation of the school.' " *Id.*

 The trial judge in the case *sub judice* departed from this standard when he stated: "[A] public employee's speech . . . is not protected by the First Amendment if it has a *potentially disruptive* impact on the public employer" (emphasis added). The trial court relied on our decision in *Roseman v. Indiana University of Pennsylvania*, 520 F.2d 1364 (3d Cir. 1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 329 (1976), in support of the "potentially disruptive" standard.[10] In our subsequent decision in *Sprague v. Fitzpatrick*, we discussed the balance which the Court enunciated in *Pickering v. Board of Education, supra*, and said, "The key question under *Pickering*, however, is whether the employment relationship has been seriously undermined . . . If the arousal of public controversy *exacerbates the disruption of public service*, then it weighs against, not for, first amendment protection in the *Pickering* balance." 547 F.2d at 566 (emphasis added). See also *Porter v. Califano*, 592 F.2d 770, 773 (5th Cir. 1979), where the court, in reversing summary judgment for defendants in a suit by a clerk–typist suspended for writing a letter sharply critical of her superiors, stated that at minimum the state must "clearly demonstrate that the employee's conduct substantially and materially interferes with the discharge of duties and responsibilities inherent in such employment." In any event, we do not find that the district court's alleged error in the selection of the standard would alone warrant reversal since the district court did find that the tactics employed by the plaintiffs "unquestionably had a disrupting effect on the University's primary mission–education and the advancement of the Arts and Sciences," and this finding satisfies even the more stringent standard of actual disruption which plaintiffs would apply.

On the other hand, the district court did err in placing the burden on plaintiffs to

---

**10.** The primary holding in the *Roseman* case, that no protected speech was involved because the speech was made privately rather than in public, was specifically overruled in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–697, 58 L.Ed.2d 619 (1979), holding that private communications do come within First Amendment protection.

show that the defendants' alleged retaliatory action would not have taken place "but for" the occurrence of the protected conduct. The district court stated:

> The *ultimate burden will be on the plaintiff* to show not merely that impermissible factors entered into the retaliatory decision or action, but also that "but for" the protected conduct the action would not have been taken. (emphasis added)

The correct formulation is precisely the opposite. The *defendant* has the burden of proving by a preponderance of the evidence that the challenged retaliatory action would have occurred anyway, even had the constitutionally protected activity not taken place. *Givhan v. Western Line Consolidated School District*, 439 U.S. at 416–17, 99 S.Ct. at 697; *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. at 287, 97 S.Ct. at 576.

Defendants argue that plaintiffs' speech was so disruptive as a matter of fact that the erroneous allocation by the district court of the burden was harmless. In light of the numerous decisions of this court reversing judgments because the district court improperly allocated the burden of proof,[11] and because we cannot determine whether the same result would have been reached had the proper allocation been made, we will reverse the court's judgment for defendants on the retaliatory action claims.[12] We reach this decision in part because we have held that the court applied incorrect legal standards in adjudicating plaintiffs' claims of unconstitutional restraint of First Amendment rights and the evidence on retrial on those claims will be inextricably connected to the alleged retaliatory action.

## V.

In addition to plaintiffs' numerous claims of infringement of First Amendment rights, plaintiffs also assert two claims of denial of due process. There is little merit to plaintiffs' claim based on the "meeting" to which some of the plaintiffs were called following release of the Gunn memorandum because plaintiffs were deprived of no liberty or property interest encompassed within the notion of due process as a result of that episode.

The second claim, based on the failure of the Board of Trustees to consider Trotman's appeal challenging his termination despite the fact that the collective bargaining agreement provides that a faculty member may appeal such a termination, may be more substantial. Plaintiffs claim that failure to follow procedural requirements established by the University's by-laws in a proceeding leading to termination violates Trotman's right to procedural due process. Since this was not discussed by the district court, we will withhold comment to give the court the initial opportunity to consider the claim.

## VI.

 The original complaint in this case contained no request for a jury trial; the amended complaint filed three years later did request a jury trial but the court granted defendants' motion to strike the request. No new issues were raised in the amended complaint sufficient to revive any right to jury trial and the district judge did not abuse his discretion in denying a jury trial. *See Walton v. Eaton Corp.*, 563 F.2d 66 (3d Cir. 1977) (en banc). However, since we are remanding this matter for a new trial, the trial judge will have the opportunity, if the

11. *See, e. g., Matter of Decker*, 595 F.2d 185, 190 (3d Cir. 1979) (case remanded because "[i]t is not for this court in the first instance to apply the appropriate burden of proof to the evidence"); *United States v. Hollis*, 569 F.2d 199, 203–04 (3d Cir. 1977) (held that even though there was evidence in the record to support district court's finding that defendant was competent at time plea was entered, case remanded "for we conclude that the court erred in placing on [defendant] the burden of proving competence").

12. In view of our disposition of this matter, we do not reach plaintiffs' claim that certain of the district court's findings were clearly erroneous. We also do not find that the district court committed any reversible error in its treatment of the arbitrators' findings on Trotman's grievance relating to his dismissal.

plaintiffs renew their motion, to reconsider whether to exercise his discretion in favor of granting a jury trial on the damage issues.

## VII.

For the reasons set forth above, we will vacate the judgment for the defendants and remand the case to the district court for further proceedings consistent with this opinion.